**DEMOCRATIC CENTRAL COMMITTEE OF the DISTRICT OF COLUMBIA, et al., Petitioners,**

**v.**

**WASHINGTON METROPOLITAN AREA TRANSIT COMMISSION, Respondent,**

**D.C. Transit System, Inc., Intervenor.**

**Nos. 21865, 24398, 24415, 24428 and 75–1632.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 15, 1984.

Decided March 15, 1988.

As Amended March 15, May 17 and June 6, 1988.

---

Supplemental Review Proceedings and Petitions for Review of Orders of the Washington Metropolitan Area Transit Commission.

Landon G. Dowdey for Democratic Central Committee of the District of Columbia, et al., petitioners in Nos. 21865 and 24398. Beverly C. Moore, Jr., Washington, D.C., also entered an appearance.

Donald J. Balsley, Jr., with whom Gregory M. Barth, and Douglas N. Schneider, Jr., Washington, D.C., were on the brief, for Washington Metropolitan Area Transit Com'n, respondent in Nos. 21865, 24398, 24415, 24428 and 75–1632.

Harvey M. Spear, with whom Stanley J. Fineman was on the brief, for D.C. Transit System, Inc., petitioner in No. 75–1632 and intervenor in Nos. 21865, 24398, 24415 and 24428. Michael B. McGovern, C. Francis Murphy and Charles A. Camalier, III, Washington, D.C., also entered appearances.

John H. Suda, Acting Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Deputy Asst. Corp. Counsel, Washington, D.C., were on the brief for District of Columbia, petitioner in No. 24415.

Gilbert Hahn, Jr., with whom Mary Kathleen Hite, Washington, D.C., was on the brief, for Black United Front, et al., petitioner in No. 24428.

Leonard N. Bebchick, Washington, D.C., was on the brief for Leonard N. Bebchick, et al., intervenors in No. 75–1632.

Before ROBINSON, Circuit Judge, MacKINNON, Senior Circuit Judge, and DAVIS, Circuit Judge.*

\* Of the United States Court of Appeals for the Federal Circuit, sitting by designation pursuant to 28 U.S.C. § 291(a).

1. In 1956, Congress granted Transit an exclusive 20-year franchise to provide a mass transportation system in the District of Columbia and its environs. Franchise Act, Pub.L. No. 84–757, § 2, 70 Stat. 598 (1956). The term of the franchise was abbreviated in 1973 when Congress transferred this responsibility to a public authority. National Capital Area Transit Act of 1972, Pub.L. No. 92–517, 86 Stat. 999.

2. See, e.g., *Powell v. Washington Metro. Area Transit Comm'n,* 158 U.S.App.D.C. 301, 302–304, 485 F.2d 1080, 1081–1083 (1973); *Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n (DCC II),* 158 U.S.App.D.C. 107, 111–116, 485 F.2d 886, 890–895 (1973), *cert. denied,* 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974); *Bebchick v. Washington Metro. Area*

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

Dissenting and Concurring Opinion filed by Senior Circuit Judge MacKINNON.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

Today we conclude yet another chapter in the protracted dispute between D.C. Transit, Inc. (Transit), formerly the franchiser of mass transportation services in the Washington metropolitan area,[1] and its patrons. The specifics of the controversy have been detailed in our prior decisions,[2] and need only be briefly recounted from time to time. In *Democratic Central Committee v. Washington Metropolitan Area Transit Commission (DCC I)*[3] and *Democratic Central Committee v. Washington Metropolitan Area Transit Commission (DCC II)*[4] we reviewed Orders Nos. 773[5] and 1052[6] of the Washington Metropolitan Area Transit Commission, which authorized, respectively, fare raises for Transit in 1968 and 1970. In those cases, we invalidated the increases and held that Transit's riders were entitled to restitution for the overcharges.[7] We remanded to the Commission for computation of the amount of restitution, and retained jurisdiction in full.

Our task now is to evaluate the Commission's calculation of the restitution award

*Transit Comm'n (Bebchick II),* 158 U.S.App.D.C. 79, 81–83, 485 F.2d 858, 860–862 (1973); *Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n (DCC I),* 158 U.S.App.D.C. 7, 10–11, 485 F.2d 786, 789–790 (1973), *cert. denied,* 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974).

3. *Supra* note 2.

4. *Supra* note 2.

5. *D.C. Transit Sys., Inc.* (Order No. 773), 72 Pub.Util.Rep. (PUR) 3d 113 (WMATC 1968).

6. *D.C. Transit Sys., Inc.* (Order No. 1052), 85 Pub.Util.Rep. (PUR) 3d 1 (WMATC 1970).

7. *DCC II, supra* note 2, 158 U.S.App.D.C. at 136, 485 F.2d at 915; *DCC I, supra* note 2, 158 U.S.App.L.C. at 50, 485 F.2d at 829.

and to resolve related issues raised by the parties. In Part I of this opinion, we consider the Commission's holding that Transit was sufficiently viable and efficient in 1970 to reap the benefit of a fare increase, and conclude that substantial evidence supports the Commission's findings in this regard. In Part II, we examine the Commission's identification of properties converted by Transit from operating to nonoperating status, the Commission's computation of the amount of value appreciation on those properties, and the extent to which that amount should be shared by Transit's farepayers. In Part III, we allow the Commission reimbursement from the restitutionary fund for the expenses it incurred in connection with the remand, but hold that all other parties should bear their own costs. We decline to rule on the request for attorneys' fees at this time, and instead remand to the Commission for additional findings pertinent thereto.[8]

## I. EFFICIENCY AND VIABILITY

The Washington Metropolitan Area Transit Regulation Compact, under which Transit operated, stipulated that the Commission could not call upon farepayers to bear the cost of inefficient management,[9] and thus required the Commission to consider Transit's operating efficiency before authorizing any fare increase. We ourselves held that Transit's patrons could not be compelled to furnish a reasonable rate of return to investors if its operations were inherently unprofitable, and that therefore the Commission must satisfy itself that Transit was economically viable before allowing a higher fare.[10]

In *DCC II*, we concluded that the Commission did not discharge its duty to consider efficiency and viability when in 1970 it set a new fare in Order No. 1052.[11] We noted that the gravity of this omission was underscored by the Commission's denial of a 1972 fare increase because Transit did not meet the efficiency and viability criteria.[12] We directed the Commission to examine these factors on remand and tell us whether there was a lack of efficiency or viability in 1970.

In compliance, the Commission sponsored a study by Pasquale A. Loconto exploring Transit's efficiency and viability at the time of the 1970 fare increase.[13] Loconto had previously reported on Transit's 1972 operating condition, and that report had played a dispositive role in the Commission's decision to deny Transit's request for a fare increase that year.[14] In addition, a Commission hearing examiner conducted 96 days of testimony on Transit's 1970 financial status, which culminated in the issuance of a 448–page report on efficiency

---

8. The Commission did not respond to two matters we earlier remanded for its consideration. One was a recommendation respecting appropriate attorneys' fees for counsel for the Bebchick group. See *Bebchick v. Washington Metro. Area Transit Comm'n (Bebchick III)*, 207 U.S. App.D.C. 161, 171, 645 F.2d 1086, 1096 (1981). We have calculated and awarded those fees ourselves. *Bebchick v. Washington Metro. Area Transit Comm'n (Bebchick IV)*, 256 U.S.App.D.C. 296, 302–306, 805 F.2d 396, 402–406 (1986). The Commission also failed to submit recommendations for utilizing the restitutionary fund for the benefit of users of public transportation. See *DCC I, supra* note 2, 158 U.S.App.D.C. at 48–49, 485 F.2d at 827–828. We will address that question at a future date after the amount of restitution is ascertained precisely.

9. Washington Metropolitan Area Transit Regulation Compact, tit. II, art. XII, § 6(a)(3), incorporated into Pub.L. No. 86–794, 74 Stat. 1031, 1040 (1960).

10. *DCC II, supra* note 2, 158 U.S.App.D.C. at 129–133, 485 F.2d at 908–912.

11. *Id.* at 134, 485 F.2d at 913.

12. *Id.;* see *D.C. Transit Sys., Inc.* (Order No. 1216) (WMATC May 19, 1972), *aff'd,* 151 U.S. App.D.C. 223, 466 F.2d 394 (1972). The Commission's conclusions on Transit's 1972 operating status were derived from Financial Analysis of D.C. Transit System, Inc. (District of Columbia) and Subsidiaries Prepared by Pasquale A. Loconto for the Washington Metropolitan Area Transit Commission March 31, 1972, *reprinted in* Appendix to Brief for Petitioner Black United Front on Viability and Efficiency Issues.

13. A Financial Analysis of D.C. Transit System, Inc. (District of Columbia) and Subsidiaries as of April 15, 1970, *reprinted in* Appendix to Brief for Petitioner Black United Front on Viability and Efficiency Issues.

14. See note 12 *supra* and accompanying text.

and viability issues.[15]  The Commission, relying on the 1970 Loconto report and other evidence, upheld the hearing officer's finding that Transit was both efficient and viable in 1970.[16]  Petitioner Black United Front (BUF) disputes this determination on several grounds.

■ BUF first contends that the Commission's holding that Transit was managed efficiently in 1970 is not supported by the record evidence.  In this regard, BUF asserts that a comparison of the two Loconto reports reveals that the same features that led to the Commission's finding of managerial inefficiency in 1972 also appeared in the 1970 Loconto Report.[17]  Our review of those two reports, as well as the reports of the hearing officer and the Commission, leaves us in disagreement with BUF's contention.  There is ample evidence in the record to underpin the Commission's conclusion that Transit's 1970 financial woes were caused, not by managerial inefficiencies, but by social factors beyond its control.[18]  Accordingly, we affirm the Commission's ruling that Transit was efficiently managed at the time of the 1970 fare elevation.

BUF also argues that the Commission misconstrued the test of viability we articulated in *DCC II*.[19]  Therein we stated that, in order to determine whether Transit was viable in 1970, the Commission should investigate and determine

(a) if and to what extent the company would have been able to make a profit if there were no regulation at all, and (b) if and to what extent Transit could then earn a sufficient return so as to make it an attractive investment at any level of fares which could have been deemed "reasonable." [20]

In phrasing our test that way, we asked the Commission to assume that Transit was operating in a hypothetical unregulated environment, and to disregard the knowledge gained from hindsight of Transit's condition after 1970.  The Commission found, on the basis of conservative financial estimates, that in 1970 Transit had the potential to continue to generate modest profits and thus it retained the interest of its shareholders and creditors.[21]  We find that the Commission's determination of viability is based on substantial evidence, and that the Commission properly carried out our instructions.[22]

---

15.  Report of the Hearing Officer, *In re: Remands from the United States Court of Appeals for the District of Columbia of D.C. Transit Sys., Inc.* (July 30, 1980).

16.  Report of the Commission on the Issues of "Efficiency" and "Viability," *In re: Remands from the United States Court of Appeals for the District of Columbia of D.C. Transit Sys., Inc.* (Aug. 31, 1981) at 9–13, 40 [hereinafter Commission's Efficiency and Viability Report].

17.  Brief for Petitioner Black United Front on Viability and Efficiency Issues at 12.

18.  Commission's Efficiency and Viability Report, *supra* note 16, at 9–13, 40.  The Commission found that civil unrest following the assassinations of Dr. Martin Luther King, Jr., and Senator Robert F. Kennedy caused an unexpected disruption in bus service attributable to riders' fear of using buses and employees' refusal to operate them.  Due in large part to these events, Transit suffered a $17 million revenue loss during 1968 and 1969.  *Id.* at 12–13.

19.  *DCC II, supra* note 2, 158 U.S.App.D.C. at 132, 485 F.2d at 911.

20.  *Id.*

21.  Commission's Efficiency and Viability Report, *supra* note 16, at 22–37.  BUF contends that the criteria for viability we articulated required the Commission to gauge Transit's attractiveness to potential investors; that Transit's financial position disabled it from securing new investors; and consequently that Transit was nonviable as a matter of law.  Brief for Petitioner Black United Front on Viability and Efficiency Issues at 22.  We conclude that, given the nature of the task before it, the Commission was free to assess Transit's viability by measuring its capacity to reward present investors, from which its ability to attract new investors could reasonably be inferred.

22.  BUF has moved to strike the hearing officer's report on the ground of bias, stating that at the time the report issued the hearing officer had left his Commission post and was employed by a holding company for a regulated public utility.  BUF submitted no other evidence of bias.  We deny the motion because BUF's submission is too tenuous to demonstrate bias, and the "burden of establishing a disqualifying interest rests on the party making the assertion." *Schweiker v. McClure*, 456 U.S. 188, 196, 102 S.Ct. 1665, 1670, 72 L.Ed.2d 1, 8 (1982).

The Commission thus has cured its neglect of Transit's efficiency and viability when it promulgated Order No. 1052 by investigating and determining those matters on remand. It follows that Transit's farepayers are not entitled to any restitution on the now-refuted theory of a lack of efficiency or viability on Transit's part in 1970.

## II. Property Issues

In *DCC I* and *DCC II*, we found that Orders Nos. 773 and 1052 were defective because the Commission had not considered the extent to which appreciation in the value of Transit's properties might have obviated the need to generate additional revenue through fare increases.[23] We held that Transit's farepayers were entitled, as restitution for fares unjustly exacted, to the accrued appreciation in value of in-service

properties subsequently converted to non-operating status.[24] We instructed the Commission to determine the amount of restitution due the farepayers by first subtracting the book value of each identified property from its market value at the time it was transferred out of service[25] and then deducting the expenses that would have been incidental to any contemporaneous sale of the property.[26]

On remand, the Commission identified sixteen properties[27] and estimated the market value of each on the date of its transfer to nonoperating status. From the property's then market value, the Commission subtracted its net book value at the time it was acquired by Transit, and the brokerage fees and tax expenses that Transit likely would have incurred had the property been sold.[28] The Commission concluded that Transit's farepayers are entitled to the benefit of $3,947,134 in appreciation to offset

---

**23.** *DCC II, supra* note 2, 158 U.S.App.D.C. at 119–123, 485 F.2d at 898–902; *DCC I, supra* note 2, 158 U.S.App.D.C. at 43, 485 F.2d at 822. The rationale of these decisions was that any gain in the value of an in-service property should have inured to the farepayers' benefit on the date that property was removed from operation. *DCC II, supra* note 2, 158 U.S.App.D.C. at 119–123, 485 F.2d at 898–902; *DCC I, supra* note 2, 158 U.S. App.D.C. at 43, 485 F.2d at 822; see note 25 *infra*. Thus, costs of service normally borne by Transit's riders had to be offset by any accrued appreciation before a fare at a particular level could be justified.

**24.** We noted that the usual method of reimbursement for a fare overcharge—deduction of the excess from future fares—was no longer possible because Transit's transportation operations had ceased. *DCC II, supra* note 2, 158 U.S.App.D.C. at 134; 485 F.2d at 913; *DCC I, supra* note 2, 158 U.S.App.D.C. at 44–45, 485 F.2d at 823–824. Accordingly, we concluded that restitution by Transit was the proper and only means for redressing the excessive fares. *DCC I, supra* note 2, 158 U.S.App.D.C. at 45, 485 F.2d at 824.

**25.** In *Bebchick II, supra* note 2, we similarly held that gains in value of operating properties should be credited to farepayers on the dates the properties were respectively transferred out of service, and not postponed until the properties were actually sold. "The properties," we said "had been, for all practical purposes, removed from the transportation business and now exist for the benefit of the investors. . . .

The wisdom we apply is that of the bird in hand." 158 U.S.App.D.C. at 95, 485 F.2d at 874.

**26.** *DCC II, supra* note 2, 158 U.S.App.D.C. at 134–135, 485 F.2d at 913–914; *DCC I, supra* note 2, 158 U.S.App.D.C. at 43 n. 343, 48, 485 F.2d at 822 n. 343, 827.

**27.** These properties were the Central Garage, the Fourth Street Shop, the Southern Carhouse, the Maryland Line Right-of-Way, the Benning Line Right-of-Way, the Northeast Carhouse, the Cabin John Right-of-Way, the Georgia & Eastern Terminal, the 14th & V Streets Substation, the 13th & D Streets Storage Yard, the Navy Yard Carhouse, the M Street Shop, the Grace Street Shop, the General Office Building, the Parking Lot and the Trinidad Garage. See Report of the Commission, *In re: Remands from the United States Court of Appeals for the District of Columbia Circuit of D.C. Transit Sys., Inc.* (June 30, 1978) Table I, *reprinted in* Joint Appendix (J.App.) vol. 1 [hereinafter Commission's Property Report]. The hearing officer had identified two additional properties, the Brookland Garage and the Eastern Garage, see Report of the Hearing Officer, *In re: Remands from the United States Court of Appeals for the District of Columbia Circuit of D.C. Transit Sys., Inc.* (Feb. 17, 1978) at 10 n. 55, *reprinted in* J.App. vol. 1 [hereinafter Hearing Officer's Property Report], but the Commission determined that these were wrongly included. See text *infra* at notes 31–33.

**28.** These figures are set forth in the Commission's Property Report, *supra* note 27, Tables I–V, J.App. vol. 1.

the increase in fares.[29]  Transit and petitioners BUF and Democratic Central Committee of the District of Columbia (DCC) dispute the Commission's action in numerous respects, and we now address their contentions in turn.

### A.  Identification Issues

The first claim is that the Commission erred in identifying the properties to be included in the computation of the restitution award.  BUF and DCC argue that the Brookland Garage and the Eastern Garage[30] were not used for operating purposes after September, 1966, and that therefore the farepayers should receive the benefit of value appreciation on those properties.[31]  The Commission supports its exclusion of the two properties by adverting to its 1966 Order No. 634,[32] which directed Transit to retain the Brookland and Eastern Garages as operating properties in order to meet supplementary service requirements should they arise.[33]  We agree that Order No. 634 is dispositive on the question of operating status of these properties and validates the Commission's decision to omit them from the calculation of accrued appreciation.  The properties cannot be deemed to have been transferred out of operating status simply because the contingency for which they were held in service never occurred.  We affirm the Commission's refusal to include the Brookland and Eastern Garages in the restitution calculus.

■ Transit argues that the Commission erred by counting the Fourth Street Shop, the Southern Carhouse and the Georgia &

Eastern Terminal among the identified properties because, Transit says, the gains on those properties were allocated by earlier orders of the Commission and its predecessor, the Public Utilities Commission of the District of Columbia (PUC).[34]  Those orders, Transit asserts, have preclusive effect, and bar any allotment of gains on the three properties to farepayers.

Transit's contention impels us to examine closely the earlier orders and the contexts in which they arose.  The Fourth Street Shop and the Southern Carhouse were transferred out of service in 1959 when they were purchased by the District of Columbia Redevelopment Land Agency at a price greatly in excess of their original cost to Transit.[35]  PUC considered the gain realized upon their sale in Order No. 4577.[36]  In the proceeding leading to that order, Transit requested an exception from standard public-utility accounting practices, which required all amounts received from the sale of depreciable property to be credited to the farepayers' depreciation reserve as salvage.[37]  Transit argued that the properties' high selling price served to rebut the assumption underlying the standard practice, namely, that the value of depreciable property will decrease with time.[38]  PUC credited $613,661.28 from the sale proceeds to the riders' depreciation reserve fund in order to compensate the farepayers for excessive depreciation accruals they had funded through payment of fares.[39]  The remaining $837,210.75 of the gain realized from the sale of the depreciable portions of

29.  Id. Table V, J.App. vol. 1.  By stipulation of the parties, this figure is subject to a $282,690 equitable offset.  Id. n.*, J.App. vol. 1; Hearing Officer's Property Report, supra note 27, at 50–52, J.App. vol. 1.

30.  See note 27 supra.

31.  See Brief for Petitioner Black United Front on Properties Issues at 15–22; Brief for Petitioner Democratic Central Committee on Transferred Properties at 20.

32.  D.C. Transit Sys., Inc. (Order No. 634) (WMATC Aug. 19, 1966), reprinted in J.App. vol. 4.

33.  Id. at 2, J.App. vol. 4.

34.  Brief for Petitioner D.C. Transit System, Inc., on Properties Market Value Appreciation at 33.

35.  Hearing Officer's Property Report, supra note 27, at 29, J.App. vol. 1; see D.C. Transit Sys., Inc. (Order No. 4577), 30 Pub.Util.Rep. (PUR) 3d 405, 405 (PUC 1959), aff'd, 110 U.S.App.D.C. 241, 292 F.2d 734 (1961).

36.  D.C. Transit Sys., Inc. (Order No. 4577), supra note 35.

37.  30 Pub.Util.Rep. (PUR) 3d at 410.

38.  Id.

39.  Id. at 411 & n. 1.

the properties, along with all of the gain on the land, was credited to Transit's earned surplus account, and thus inured to the benefit of Transit's investors.[40] We affirmed PUC's disposition in 1961.[41]

The Georgia & Eastern Terminal was transferred out of service in 1960, and sold privately approximately two years later.[42] When the Commission was called upon to distribute the proceeds from the sale of the terminal in Order No. 563,[43] it credited all of the profit to Transit's earned surplus account.[44] The Commission's decision was not appealed.

In order to determine the effect of PUC's Order No. 4577 and the Commission's Order No. 563 on the problem before us, we are guided by venerable principles of issue preclusion. Generally, "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment . . . the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."[45] With but few exceptions, however, issue preclusion cannot be asserted against a nonparty to a prior proceeding,[46] and preclusive effect is given only to issues "actually litigated and . . . essential to the judgment" therein.[47] The party invoking the prior judgment as a barrier to relitigation has the burden of establishing that the conditions for preclusion have been satisfied,[48] and Transit has not met that burden here.

The allocation of the gain on the Fourth Street Shop and the Southern Carhouse in PUC's Order No. 4577 does not foreclose a reallocation in this case because the parties here are not identical to, or in privity with, the parties to the earlier litigation. Only Transit and the Commission—then PUC— were parties to the proceeding leading to Order No. 4577 and judicial review thereof;[49] the farepayers had no presence or representation therein at all. While a nonparty may under certain conditions be bound when "[a]n official or agency invested by law with authority to represent the person's interests" was a party to the first proceeding,[50] that proposition can have no bearing here. PUC's representation of the public interest was not exclusively for farepayers and the many battles fought by

**40.** *Id.* at 411.

**41.** *D.C. Transit Sys., Inc. v. Public Utils. Comm'n,* 110 U.S.App.D.C. 241, 292 F.2d 734 (1961).

**42.** Hearing Officer's Property Report, *supra* note 27, at 41 & n. 133, J.App. vol. 1.

**43.** *D.C. Transit Sys., Inc.* (Order No. 563), 63 Pub.Util.Rep. (PUR) 3d 32 (WMATC 1966).

**44.** *Id.* at 33–34.

**45.** Restatement (Second) of Judgments § 27 (1982). Accord, 18 C. Wright, A. Miller & E. Cooper, Federal Practice § 4416 (1981); see *Norfolk & W. Ry. v. United States,* 247 U.S.App. D.C. 256, 261, 768 F.2d 373, 378 (1985); *National Treasury Employees Union v. IRS,* 247 U.S. App.D.C. 20, 22, 765 F.2d 1174, 1176 (1985); *Jack Faucett Assocs. v. American Tel. & Tel. Co.,* 240 U.S.App.D.C. 103, 110, 744 F.2d 118, 125 (1984), *cert. denied,* 469 U.S. 1196, 105 S.Ct. 980, 83 L.Ed.2d 982 (1985); *Western Coal Traffic League v. ICC,* 236 U.S.App.D.C. 377, 379, 735 F.2d 1408, 1410 (1984); *Stewart v. National Shopmen Pension Fund,* 235 U.S.App.D.C. 122, 126, 730 F.2d 1552, 1556, *cert. denied,* 469 U.S. 834, 105 S.Ct. 127, 83 L.Ed.2d 68 (1984); *Otherson v. Department of Justice,* 228 U.S.App.D.C. 481, 487, 711 F.2d 267, 273 (1983).

**46.** *Sea–Land Servs. v. Gaudet,* 414 U.S. 573, 593, 94 S.Ct. 806, 819, 39 L.Ed.2d 9, 25–26 (1974); *Ethnic Employees of Library of Congress v. Boorstin,* 243 U.S.App.D.C. 186, 190, 751 F.2d 1405, 1409 (1985); *Gerrard v. Larsen,* 517 F.2d 1127, 1132–1133 (8th Cir.1975); *United States v. Brown,* 761 F.2d 1272, 1276 (9th Cir.1985); Restatement (Second) of Judgments § 34(3) (1982).

**47.** Restatement (Second) of Judgments § 27 (1982); see *IAM Nat'l Pension Fund v. Industrial Gear Mfg. Co.,* 232 U.S.App.D.C. 418, 423, 723 F.2d 944, 949 (1983); *Otherson v. Department of Justice, supra* note 45, 228 U.S.App.D.C. at 488, 711 F.2d at 274; *Nasem v. Brown,* 193 U.S.App. D.C. 416, 420, 595 F.2d 801, 805 (1979); *Tutt v. Doby,* 148 U.S.App.D.C. 171, 175, 459 F.2d 1195, 1199 (1972).

**48.** See, e.g., *American Employers Ins. Co. v. American Sec. Bank,* 241 U.S.App.D.C. 379, 384, 747 F.2d 1493, 1498 (1984); *Allen v. Zurich Ins. Co.,* 667 F.2d 1162, 1166 (4th Cir.1982).

**49.** See *D.C. Transit Sys., Inc.* (Order No. 4577), *supra* note 35; *D.C. Transit Sys., Inc. v. Public Utils. Comm'n, supra* note 41.

**50.** Restatement (Second) of Judgments § 41(1)(d) (1982).

citizens against fare increases for Transit [51] illustrate that the Commission's representation of them was clearly less than the advocacy of private parties.[52] Furthermore, it would be unfair to now forestall farepayers simply on the basis of PUC's participation in the earlier proceeding because the interests of PUC and Transit's farepayers differed markedly.[53] The position advanced by DCC and BUF in the *DCC* cases—that all in-service property appreciation should be allocated to farepayers—was not advocated by PUC when it issued Order No. 4577, and was in fact opposed by the Commission, its successor, both in *DCC I* and *DCC II.* Our *DCC* holdings cannot be frustrated by a prior proceeding in which the farepayers had no meaningful voice.

The allocation of the gain from the sale of the Georgia & Eastern Terminal in Order No. 563 similarly fails to bind the parties here. While the interests of farepayers were represented in the proceeding culminating in that order, the question of proper allocation of in-service appreciation was neither actually litigated nor necessary to the outcome thereof. Order No. 563 was precipitated by this court's determination in *D.C. Transit System, Inc. v. Washington Metropolitan Area Transit Commission* [54] that any gain realized on depreciable property sold in consequence of Transit's termination of trolley service must be used to offset the farepayers' liability for losses suffered on other property conveyances occasioned by the conversion from a trolley-bus to an all-bus system.[55] We remanded to the Commission to enable it to determine whether the profitable sale of the Georgia & Eastern Terminal was a result of the conversion and, if so, to "address itself to the question ... whether the riders should be afforded some participation in the benefits of the sale." [56] There is no indication that the parties litigated any other issue on remand. The Commission found that "the sale of the terminal was occasioned neither in whole nor in part by the abandonment of rail operations," [57] but went further, however, to say that "the ratepayer is not entitled to a share in any portion of the proceeds of that sale, unless there was a profit on the depreciable portion of the asset sold. There was none in this case." [58]

We decline to give the latter statement any preclusive effect with regard to the existence or ultimately proper allocation of in-service value appreciation of the Georgia & Eastern Terminal. The question of allocation was not raised or litigated by the parties,[59] and a determination of that mat-

51. See, e.g., *Powell v. Washington Metro. Area Transit Comm'n, supra* note 2; *Bebchick II, supra* note 2; *Williams v. Washington Metro. Area Transit Comm'n,* 134 U.S.App.D.C. 342, 415 F.2d 922 (*en banc* 1968), cert. denied, 393 U.S. 1081, 89 S.Ct. 860, 21 L.E.2d 773 (1969); *Payne v. Washington Metro. Area Transit Comm'n,* 134 U.S.App.D.C. 321, 415 F.2d 901 (1968).

52. The American Law Institute distinguishes between agencies granted exclusive authority to litigate on behalf of the public and agencies whose legal authority coexists with that of private citizens. Restatement (Second) of Judgments § 41 comment d (1982). As to the former, no question of preclusion can arise because individuals have no standing to sue. *Id.* As to the latter, one must determine whether the agency's action preempts individual action. *Id.* Non-preemptive agency action does not prevent a later suit by an individual. *Id.* § 41 comment d & illustration 7.

53. See *Consumers Union v. Consumer Prod. Safety Comm'n,* 192 U.S.App.D.C. 93, 101–102, 590 F.2d 1209, 1217–1218 (1978) (a reverse-FOIA action defended by the Consumer Product Safe-

ty Commission does not bar a later FOIA action by a consumer group because the Commission and the consumers have divergent interests), *rev'd on other grounds sub nom. GTE Sylvania, Inc. v. Consumers Union,* 445 U.S. 375, 100 S.Ct. 1194, 63 L.Ed.2d 467 (1980).

54. 121 U.S.App.D.C. 375, 350 F.2d 753 (*en banc* 1965).

55. *Id.* at 397–398, 350 F.2d at 775–776.

56. *Id.* at 398, 350 F.2d at 776.

57. *D.C. Transit Sys., Inc.* (Order No. 563), *supra* note 43, 63 Pub.Util.Rep. (PUR) 3d at 34.

58. *Id.*

59. See, e.g., *American Employers Ins. Co. v. American Sec. Bank, supra* note 48, 241 U.S.App. D.C. at 384, 747 F.2d at 1498; *Allen v. Zurich Ins. Co., supra* note 48, 667 F.2d at 1166; *Diplomat Elec., Inc. v. Westinghouse Elec. Supply Co.,* 430 F.2d 38, 45 (5th Cir.1970); *Hunter*

ter was not essential to the Commission's decision, for once it found that the Georgia & Eastern sale was not prompted by the conversion, the purpose of this court's remand was achieved.[60] Under these circumstances, we refuse to accept the Commission's inconsequential observation in Order No. 563 as a barrier to the farepayers' endeavor here.

The absence of preclusion does not, however, lead us to allocate the entire gain on these three properties to the farepayers. When PUC issued Order No. 4577, it directed that $613,661.28 of the gain realized on the sale of the Fourth Street Shop and the Southern Carhouse be credited to Transit's depreciation reserve,[61] and that credit redound to the benefit of the farepayers. Consequently, our calculation of the farepayers' entitlement must be reduced by an equivalent amount to avoid a double benefit.

## B. Calculation of Gains

Petitioners raise four issues concerning the Commission's computation of gains by appreciation of the identified properties. We consider each of these disputes seriatim, and find that the Commission ruled correctly in most respects but erred in several.

### 1. Accounting Methods

Transit contends that in calculating the gain allocable to farepayers, the Commission should have employed the "market-to-market" method of accounting[62] rather than the "book-to-market" method.[63] Because the market value of the properties exceeded their book value—their cost to Transit—at the time they were acquired, Transit asserts that the book-to-market method denies it the benefit of bargain purchases.[64] We have weighed and rejected this very argument in both of our prior DCC decisions. In DCC I, we told the Commission to compute the "dollar amount of restitution ... by subtracting the book value of the properties from the market value at the time of the transfer."[65] Similarly, in DCC II, we directed the Commission to calculate "the amount of the increase in market value over book value of lands which Transit" transferred out of service.[66] On remand, the Commission heeded our instructions, and we can see no reason to reconsider them now.

### 2. Value of the Fourth Street Shop and the Southern Carhouse

■ As we have mentioned, the Fourth Street Shop and the Southern Carhouse were sold under threat of condemnation to the District of Columbia Redevelopment Land Agency for a combined price of $2,954,693.[67] On remand, the Commission decided that for purposes of restitution it would calculate appreciation on these properties by utilizing their market value, rather than their actual selling price, at the time. The Commission found that the selling price did not accurately reflect true market value since the sale took place in the presence of a looming prospect of con-

Douglas, Inc. v. Sheet Metal Workers Int'l Ass'n, 553 F.Supp. 324, 326–327 (M.D.N.C. 1982), aff'd, 714 F.2d 342 (4th Cir.1983).

60. See, e.g., American Employers Ins. Co. v. American Sec. Bank, supra note 48, 241 U.S.App. D.C. at 384, 747 F.2d at 1498; Consumer Prod. Safety Comm'n v. Anaconda Co., 193 U.S.App. D.C. 160, 168, 593 F.2d 1314, 1322 (1979).

61. See text supra at notes 38–39.

62. This method involves calculation of the gain by subtracting the market value of the property when it was placed in service from its market value when it was taken out of service.

63. This method uses as the subtrahend cost or book value of the property when it was entered into service rather than the market value at that time.

64. See Brief for Petitioner D.C. Transit System, Inc., on Properties Market Value Appreciation at 20–32.

65. DCC I, supra note 2, 158 U.S.App.D.C. 48, 485 F.2d at 827.

66. DCC II, supra note 2, 158 U.S.App.D.C. at 135, 485 F.2d at 914.

67. Hearing Officer's Property Report, supra note 27, at 30, J.App. vol. 1.

demnation.[68] On this account, the Commission based its computation of gain upon its expert's estimate of their combined market value of $1,847,500 [69] when the sale occurred. BUF objects to the use of estimated market values for properties sold simultaneously with their transfer out of service,[70] and argues in the alternative that the Commission should simply have accepted the actual sale price of the two properties as conclusive evidence of their market value.[71] We hold that, for the purpose of calculating the gain allocable, the sale price should have been employed.

The Commission misconceived the role of market value in determining the amount due farepayers as restitution. Generally speaking, estimated market value is pertinent, only because—and only to the extent that—we lack a selling price for the date pertinent.[72] With respect to the two properties under discussion, however, the selling price is available, and its use is more appropriate because it provides precisely the information that only less dependably

could be sought by an appraisal of market value. Had the appraiser's estimate of market value exceeded the actual sale price, it would have been unfair to require Transit to make restitution in an amount greater than the profit actually realized; by the same token, Transit is not entitled to a windfall merely because the sale price of the Fourth Street Shop and the Southern Carhouse exceeded market value by more than $1 million.[73] The theory underlying our *DCC* decisions [74] dictates the conclusion that farepayers should receive the benefit of the actual gain on the properties in this instance.[75]

### 3. Brokerage Fees and Taxes on the Sale of the Fourth Street Shop and the Southern Carhouse

BUF lofts a similar objection to the Commission's allowance of deductions for theoretical brokerage fees and federal taxes in connection with the sale of the Fourth Street Shop and the Southern Carhouse.[76] Since Transit paid no brokerage fees or

**68.** Commission's Property Report, *supra* note 27, at 14–15, J.App. vol. 1; Hearing Officer's Property Report, *supra* note 27, at 33–34, J.App. vol. 1.

**69.** Hearing Officer's Report, *supra* note 27, at 34, J.App. vol. 1.

**70.** See Brief for Petitioner Black United Front on Properties Issues at 23–26.

**71.** See Brief for Petitioner Black United Front on Properties Issues at 23–29.

**72.** Thus we view as irrelevant the decisions cited by BUF and Transit concerning the place of condemnation awards in assessing the fair market value of a comparable property. See Answering Brief for Petitioner D.C. Transit System, Inc., on Properties Market Value Appreciation at 17 (discussing *District of Columbia Redev. Land Agency v. 61 Parcels of Land*, 98 U.S.App. D.C. 367, 235 F.2d 864 (1956)); Brief for Petitioner Black United Front on Properties Issues at 26–27 (discussing *Nash v. District of Columbia Redev. Land Agency*, 129 U.S.App.D.C. 348, 395 F.2d 571 (1967), *cert. denied*, 393 U.S. 844, 89 S.Ct. 127, 21 L.Ed.2d 115 (1968)).

**73.** See notes 67, 69 *supra* and accompanying text. Normally, it would be expected that property sold under threat of condemnation would command a price below market value. Apparently the Commission also wondered about the anomalous result witnessed here, see Commis-

sion's Property Report, *supra* note 27, at 14–15, J.App. vol. 1, but the staff's probing uncovered no explanation, *id.*, J.App. vol. 1. The hearing officer mistakenly believed that the sale price and the estimated market value yielded net gain figures that were "very close" to each other. See Hearing Officer's Property Report, *supra* note 27, at 34, J.App. vol. 1. This erroneous conclusion stemmed from a failure to deduct the depreciated cost of buildings from the estimated gain. The officer's comparison also, without comment, assumed that the $613,661.28 previously credited to Transit's earned surplus account in Order No. 4577, see text *supra* at note 39, would be subtracted from the sale price but not from the estimated value. We cannot know whether or to what extent these inconsistencies affected the officer's decision on the valuation of these two properties.

**74.** *DCC I, supra* note 2, 158 U.S.App.D.C. at 26–32, 485 F.2d at 805–811 (concluding that farepayers should benefit to the full extent of gain on the properties). Accord, *DCC II, supra* note 2, 158 U.S.App.D.C. at 119, 485 F.2d at 898.

**75.** Of course, our decision on this issue does not affect the market values used by the Commission to calculate gains on the other properties, as none of the others was sold simultaneously with removal from operating status.

**76.** Brief for Petitioner Black United Front on Properties Issues at 29–31.

taxes when it sold these properties, BUF argues that the Commission should not have permitted deductions for these theoretical expenses.[77] We agree with BUF that only brokerage fees actually paid should be subtracted from amount of appreciation due farepayers. Because, however, taxes on the sale were merely deferred, not forgiven, we hold that tax expenses on the two properties should be computed in the manner we later prescribe for the other identified properties.[78]

Our decision that a deduction for brokerage fees should be limited to those actually paid follows from our ruling that the actual net sale price for the properties guides the amount of restitution to which farepayers are entitled. In *DCC I*, we directed the Commission to calculate the net gain on the identified properties by subtracting from the amount of value appreciation "the taxes and sale expenses which would have been deducted from Transit's profit if the assets had been sold outright instead of simply being moved into nonoperating status."[79] Here again we need not use an estimate, for the properties were "sold outright" on the same day they were moved "below the line"—that is, from operating to non-operating status. Since the sale under scrutiny was effected without payment of any brokerage fee, the Commission's allowance of a deduction for such a fee conferred a windfall on Transit.[80]

█ Tax expenses are distinguishable from other sales costs in one important respect. Federal tax liability on the sale of the Fourth Street Shop and the Southern Carhouse was deferred because Transit invested the proceeds from the sale in "like-kind property."[81] Unlike brokerage fees, which will never be paid, taxes attributable to the gain on these properties will ultimately fall on Transit when it disposes of the replacement properties.[82] Consequently, the tax liability on these properties should be deducted from the amount payable to farepayers as restitution.

### 4. Capital Gains Tax Calculations

In the *DCC* cases, we remanded to the Commission with instructions to calculate the capital gains taxes on all appreciated properties, and to deduct the amount thereof from the farepayers' restitution award.[83] The Commission computed the tax expense prospectively, reckoning that future dispositions could result in a 28.75 percent tax rate on property appreciation, and concluding that Transit was entitled to a deduction for taxes at that rate.[84] The farepayers

---

**77.** Brief for Petitioner Black United Front on Properties Issues at 30.

**78.** See text *infra* at notes 90–99.

**79.** *DCC I, supra* note 2, 158 U.S.App.D.C. at 43 n. 343, 485 F.2d at 822 n. 343. We incorporated this instruction in *DCC II, supra* note 2, 158 U.S.App.D.C. at 135, 485 F.2d at 914.

**80.** See note 82 *infra*.

**81.** Internal Revenue Code § 1033 permitted tax deferral in certain situations where proceeds from an involuntary conversion of property are invested in similar property. 26 U.S.C. § 1033 (1982).

**82.** Under § 1033, the basis of the involuntarily converted property carries over to the replacement property. *Id.* Thus, the gain on the original property, though not recognized at the time of conversion, will become subject to taxation at the time of disposition of the replacement property.

Transit and the Commission argue that since the sale proceeds were invested in like-kind property and in a future sale of the replacement property Transit may incur brokerage fees, deduction of an imputed fee on the original conveyance is now appropriate. We disagree. Brokerage fees are assessed on the total sale price of property, and are not affected by the amount of gain realized on the sale. Since it will be immaterial, for purposes of computing the brokerage fee upon sale of the replacement property, that no such fee was paid on the original sale of the Fourth Street Shop and the Southern Carhouse, we see no reason to impute any portion of future fees to the sale in question.

**83.** See note 79 *supra* and accompanying text.

**84.** *Commission's Property Report, supra* note 27, at 22, J.App. vol. 1. The hearing officer had recommended a tax deduction rate of 25%, based on the highest marginal federal rate in effect at the time the properties were removed from operating status. Hearing Officer's Property Report, *supra* note 27, at 74, J.App. vol. 1. The Commission felt that the deduction should reflect the additional 3.75% capital gains tax now imposed by the District of Columbia, since, although this tax was not in effect at the time

414

attack this calculation from several quarters.

■ BUF and DCC first challenge Transit's entitlement to any deduction at all for capital gains taxes. They note that farepayers have already been required to shoulder Transit's tax burden in the form of increased fares, since each rate escalation included a component to compensate for additional income taxes generated thereby.[85] They further contend that Transit stands to benefit from a substantial tax deduction when it makes restitution.[86] These parties therefore insist that fairness militates against any requirement that farepayers take on Transit's capital gains taxes.

We believe that these arguments overlook a key factor. It is true that the Commission, during Transit's operating years, set fares at a level sufficient to produce enough revenue to cover Transit's income tax expenses. BUF and DCC, however, fail to acknowledge that restitution will reimburse farepayers for the totality of fare excessiveness. Farepayers thus will be made whole once the process of restitution is completed.

We also remain unpersuaded by the farepayers' assertion that no liability on their part for taxes need be recognized because Transit stands to recoup tax expenses through deduction of the restitution award. We put aside an identical contention in *Bebchick III*,[87] stating that "[a]s for the taxes to be saved by Transit in the future years in which it pays restitution ..., we cannot calculate that saving or even [determine whether] it will exist." [88] Furthermore, petitioners' argument is foreclosed by our determination in *DCC I* that Transit is entitled to offset its capital gains liability from the amount owing to farepayers.[89] We find nothing new in the farepayers' current objection, and hold that estimated capital gains taxes should be deducted from the restitution award.

■ The second objection, pressed only by BUF, relates to the Commission's computation of the deduction for capital gains taxes. BUF insists that the Commission erred in predicating its calculation on anticipated future transfers of the properties,[90] since we directed formulation of the deduction on the basis of the taxes Transit would have paid had it sold the properties on the dates they were taken out of service.[91] The Commission endeavors to support its methodology by noting that "Transit cannot roll back the clock and sell the properties when the rates were lower or tax advantages would have been available," [92] and by arguing further that had property appreciation been taken into account when it authorized the fare increases, it would have computed the tax offset at the highest prospective marginal rate.[93] We agree with BUF that the taxes should have been calculated as if the properties were actually sold on the dates they respectively shed their operating status, and we must remand to the Commission for recalculation of the tax offsets accordingly.

In our *DCC* cases, we ordered the Commission to compute and subtract from the restitution award "the taxes ... which would have been deducted from Transit's

properties were taken out of service, it was subsequently enacted and would be imposed when later they were conveyed. Commission's Property Report, *supra* note 27, at 22, J.App. vol. 1.

85. See Brief for Petitioner Democratic Central Committee on Transferred Properties at 10; Answering Brief for Petitioner D.C. Transit System, Inc., on Properties Market Value Appreciation, Appendix 1 at 19.

86. See Brief for Petitioner Black United Front on Properties Issues at 31–39; Brief for Petitioner Democratic Central Committee on Transferred Properties at 9–17.

87. *Supra* note 8.

88. 207 U.S.App.D.C. at 167, 645 F.2d at 1092.

89. *DCC I, supra* note 2, 158 U.S.App.D.C. at 43 n. 343, 485 F.2d at 822 n. 343.

90. See note 84 *supra* and accompanying text.

91. Brief for Petitioner Black United Front on Properties Issues at 40–41.

92. Brief for Respondent Washington Metropolitan Area Transit Commission on Properties Issues at 43.

93. *Id.* at 41 & n. 104.

profit if the assets had been sold outright instead of simply being moved into non-operating status." [94] This harmonized with our admonition in *Bebchick II* [95] that any recovery by farepayers must "tak[e] into account taxes and costs which might have reduced the gain if the properties had been sold." [96] In light of this clear mandate, the Commission erred in calculating Transit's tax offset by considering the assumed impact of hypothetical sales at wholly uncertain points in the future. The mere fact that the Commission would have deducted prospective taxes had it given attention to property appreciation in the formulation of the contested fare orders does not persuade us that it should do so now. Indeed, when confronted by the same argument in *Bebchick III*, we declared that "it is wholly reasonable to make a hypothetical recalculation of Transit's taxes *for the transfer years* to see what tax impact the assumed gain would presumptively have had. There is no compelling need to try to compute the burden Transit will actually bear when it comes to sell the property." [97] Given the similarity of our directives in *Bebchick II* and the *DCC* cases, we think the rationale of *Bebchick III* controls here.

We therefore will remand to the Commission for recomputation of the tax offset on the basis of Transit's tax posture in the years during which the identified properties were respectively transferred out of service. The offset should reflect Transit's actual tax rate, and as well any credits or deductions that were available to Transit for the operative periods. [98] The hearing officer entertained detailed testimony from a Commission staff member on Transit's

tax position during the years that properties were removed from service. The Commission would be well advised to draw upon this evidence in the calculation of Transit's deductible tax expenses. [99]

### C. *Calculation of Restitution*

In the previous sections of this opinion, we have delineated the methodology appropriate for computation of the amount of value appreciation available for inclusion in an award of restitution. Transit and BUF seek adjustments in the restitutional amount. Transit argues that the amount of restitution in *DCC I* should be limited to $738,720; that Transit should be permitted to set bus maintenance and cost-of-living expenses off against the amount of restitution; and that Transit is entitled to additional offsets by reason of equitable considerations. BUF asks for interest on the award of restitution. We now consider each of these claims.

#### 1. *Amount of Restitution Available in DCC I*

Transit urges us to limit restitution in *DCC I* to $738,720, the aggregate of excess fares collected during the period in which the invalid fare raise allowed by Order No. 773 was in effect. [100] Since this order superseded, and was in turn superseded by, rate orders that were never appealed by the farepayers, Transit argues that the Commission's recommended award of $2,605,588 as restitution in that case violates principles of claim preclusion by reopening fare proceedings that were never challenged in court, and thereby deprives Transit of its property without due process

**94.** *DCC I, supra* note 2, 158 U.S.App.D.C. at 43 n. 343, 485 F.2d at 822 n. 343. Accord, *DCC II, supra* note 2, 158 U.S.App.D.C. at 135, 485 F.2d at 914.

**95.** *Supra* note 2.

**96.** 158 U.S.App.D.C. at 97, 485 F.2d at 876.

**97.** *Bebchick III, supra* note 8, 207 U.S.App.D.C. at 167, 645 F.2d at 1092 (emphasis added).

**98.** The hearing officer refused to consider the extent to which Transit's tax liabilities during the transfer years could be offset by net operat-

ing losses that could have been carried back to lessen them. Hearing Officer's Property Report, *supra* note 27, at 74–75, J.App. vol. 1. We believe that loss carrybacks, and all other available forms of tax relief, should be taken into account in calculation of the offset.

**99.** See *Bebchick III, supra* note 8, 207 U.S.App.D. C. at 168, 645 F.2d at 1093 (directing Commission to utilize such estimates when computing the tax offset).

**100.** Brief for Petitioner D.C. Transit System, Inc., on Properties Market Value Appreciation at 52.

of law.[101] We find these contentions unavailing.

Order No. 773 went into effect on January 28, 1968,[102] and was replaced 277 days later by Order No. 882.[103] Two further fare increases were authorized while Transit remained in operation under its franchise.[104] The hearing officer and the Commission found that the fare set in Order No. 773—the subject of review in *DCC I*—served as the base fare for all subsequent orders, and thus that its effect persisted until Transit ceased transportation operations.[105] We agree with the Commission that the maximum amount of restitution allowable in *DDC I* is the fare increment authorized by Order No. 773 over the remainder of Transit's life as a public utility.[106] This conclusion does not disturb any authorization of an additional fare increase following Order No. 773, and thus raises no issue of preclusion or due process.[107]

### 2. *Bus Maintenance and Cost-of-Living Allowances*

Transit asks us to deduct from the amount of restitution the sums owed Transit for bus maintenance and cost-of-living allowances. In *Bebchick II*, we held that the Commission had undercompensated Transit for its expenditures for maintenance of its buses, and that Transit was entitled to recoup the balance.[108] In a related case, we ruled that Transit was entitled to reimbursement for additional expenses of labor it incurred under a cost-of-living escalation clause in its bargaining agreement.[109] Transit has requested that these sums be subtracted from the amount of restitution emanating from either *Bebchick III* or this proceeding.[110] Since the bus maintenance offset has already been allowed in *Bebchick IV*,[111] we need only consider whether Transit is entitled to deduct the extra cost-of-living expenses from the restitution award herein.

In *D.C. Transit System, Inc. v. Washington Metropolitan Area Transit Commission*,[112] we ordered that the added expense attributable to the cost-of-living clause "be set off against whatever amounts ... are determined to be necessary to restore to the farepayers through the equitable restitutional remedies man-

---

101. *Id.* at 52–59.

102. Hearing Officer's Property Report, *supra* note 27, at 86, J.App. vol. 1.

103. *Id.*, J.App. vol. 1.

104. *Id.* at 87–88, J.App. vol. 1. The latter of the two is Order No. 1052, the subject of review in *DCC II*.

105. The Commission quoted from the hearing officer's report in that regard:
"It should be noted that the revenue requirement and fares established in Order No. 773 were never reduced. The later fare orders built on the base established in Order No. 773 and, in that sense, Order No. 773 was operative throughout Transit's life as a public utility as the foundation upon which all subsequent fare orders were built. Orders Nos. 882, 984, and 1052 may be viewed as incremental to Order No. 773."
Commission's Property Report, *supra* note 27, at 26 (quoting Hearing Officer's Property Report, *supra* note 27, at 88, J.App. vol. 1), J.App. vol. 1.

106. The hearing officer estimated the amount of restitution at $4,820,000. Hearing Officer's Property Report, *supra* note 27, at 88, J.App. vol. 1.

107. Because of our disposition of this issue, we need not discuss the Commission's alternative theory that any excess award calculated in *DCC I* may be carried over to supplement the restitution amount in *DCC II*. See Commission's Property Report, *supra* note 27, at 28, J.App. vol. 1; Hearing Officer's Property Report, *supra* note 27, at 89, J.App. vol. 1.

108. *Bebchick II, supra* note 2, 158 U.S.App.D.C. at 89, 485 F.2d at 868. The Commission later determined this to be $273,060. See *Bebchick IV, supra* note 8, 256 U.S.App.D.C. at 300 n. 14, 805 F.2d at 400 n. 14.

109. *D.C. Transit System, Inc. v. Washington Metro. Area Transit Comm'n*, 158 U.S.App.D.C. 102, 107, 485 F.2d 881, 886 (1973). The amount due Transit on labor costs was subsequently calculated at $283,869. See *Bebchick IV, supra* note 8, 256 U.S.App.D.C. at 300 n. 15, 805 F.2d at 400 n. 15.

110. Brief for Petitioner D.C. Transit System, Inc., on Properties Market Value Appreciation at 79.

111. *Bebchick IV, supra* note 8, 256 U.S.App.D.C. at 300 & n. 14, 805 F.2d at 400 & n. 14.

112. *Supra* note 109.

dated" in other Transit cases.[113] We think it appropriate to permit that offset here. The sum of $283,869,[114] representing this item will accordingly be subtracted from the amount of restitution ultimately found due.

### 3. *Equitable Considerations*

■ Transit advances five grounds upon which it contends that equitable adjustments in the amount of restitution are in order. First, Transit maintains that the restitution should not be computed in a manner that would deprive its investors of a reasonable rate of return.[115] The Commission estimated that the fares authorized by Order No. 773 would generate a net operating income of approximately $1.5 million, but Transit's actual net operating income fell short of this calculation by approximately $1.3 million.[116] Similarly, actual net operating income derived during the life of Order No. 1052 was nearly $5.5 million lower than Commission projections.[117]

Transit now argues, in effect, that it should be reimbursed for these income deficiencies. We cannot agree. A fare once set cannot be given retroactive operation by either the Commission or this court.[118] The fares established by Orders Nos. 773 and 1052 were based upon the Commission's best estimates of the amounts of revenue necessary to meet Transit's costs of service and produce a reasonable rate of return for its investors. The simple fact that these estimates were not borne out by experience does not support Transit's argument since, as we held long ago, Transit is not guaranteed a minimum rate of return.[119] Transit's investors were required to shoulder the risk that the company's earnings might not support the expected return, just as they enjoyed the right to keep any larger amounts legitimately earned. Any other approach would have forced farepayers to insure Transit's profitability.

Transit's second equitable argument is that it should be permitted to retain the amount of value appreciation attributable to the difference between market value and book value of the identified properties on the date they were acquired.[120] We have already considered and rejected this argument, and Transit gives us no reason to continue the dialogue.[121]

■ Third, Transit seeks reimbursement for monies paid to the District of Columbia in consequence of Transit's contractual obligation to remove abandoned trolley tracks and repair the streets.[122] At the time of the franchise agreement, PUC estimated the cost of doing so at $10,441,958 and established for that purpose a reserve to be subsidized by Transit at an annual rate of $1,044,196 for ten years.[123] The annual accruals were treated as operating expenses and charged to farepayers through rate increases.[124] By December of 1962,

113.  158 U.S.App.D.C. at 107, 485 F.2d at 886.

114.  See note 109 *supra*.

115.  Brief for Petitioner D.C. Transit System, Inc., on Properties Market Value Appreciation at 65–70.

116.  Transit Exhibit 51, J.App. vol. 3 at 125.

117.  Transit Exhibit 53, J.App. vol. 3 at 127.

118.  *DCC I, supra* note 2, 158 U.S.App.D.C. at 44, 485 F.2d at 823; *Williams v. Washington Metro. Area Transit Comm'n, supra* note 51, 134 U.S. App.D.C. at 360–361, 415 F.2d at 940–941.

119.  *D.C. Transit Sys., Inc. v. Washington Metro. Area Transit Comm'n, supra* note 54, 121 U.S. App.D.C. at 387–388, 350 F.2d at 765–766.

120.  Brief for Petitioner D.C. Transit System, Inc., on Properties Market Value Appreciation at 70–72.

121.  See Part II(B)(1) *supra*.

122.  Brief for Petitioner D.C. Transit System, Inc., on Properties Market Value Appreciation at 72–74. Congress imposed this obligation on Transit in the franchise agreement. Franchise Act, Pub.L. No. 84–757 § 7, 70 Stat. 598, 599 (1956).

123.  See *D.C. Transit Sys., Inc. v. Washington Metro. Area Transit Comm'n, supra* note 54, 121 U.S.App.D.C. at 389, 350 F.2d at 767.

124.  *D.C. Transit Sys., Inc.* (Order No. 245), 48 Pub.Util.Rep. (PUR) 3d 385, 395 (WMATC 1963), *aff'd, D.C. Transit Sys., Inc. v. Washington Metro. Transit Comm'n, supra* note 54.

accruals to the reserve totaled $6,656,-748.22, of which only $1,842,499.10 had been expended by Transit on track removal. At that time, the Commission estimated that track removal planned through mid–1965 would cost an additional $4.1 million,[125] and ruled that, since the reserve was already sufficient to fund the projects anticipated, further additions to the reserve should be suspended indefinitely.[126] We affirmed the Commission's decision.[127]

In January of 1973, in contemplation of Transit's imminent demise as a public utility, the District of Columbia assumed Transit's track removal duties in exchange for a payment by Transit of $3,290,000.[128] This amount exceeded the balance available in the reserve by $3,128,292,[129] which Transit now claims as an offset against the restitution award. To buttress its position, Transit points out that when we approved the Commission's decision to halt accruals to the reserve for track removal, we observed that "neither the Commission nor we have foreclosed Transit, should it in fact incur expenses for track removal in excess of existing reserves at some time in the future, from seeking to recover such expenses from the users of its service."[130] Since Transit had no opportunity to recover the excess of $3,128,292 from farepayers—because it was incurred after its franchise was terminated—it insists that equity calls for reimbursement through the medium of an offset in this amount.

Several factors convince us that Transit is not entitled to an equitable offset on this account. In the first place, we cannot know the extent to which the long delay in removing the trolley tracks caused the expense thereof to rise. From aught that appears, the accumulation in the reserve may have been adequate had the track removal program been carried out expediently; instead, the reserve was constantly and substantially eroded over the years by escalating costs. In the degree that Transit's dalliance increased the expense of track removal, it would be unfair to charge farepayers by reducing the amount of restitution. In addition, we are left in the dark as to the effect of Transit's settlement with the District. Obviously, farepayers should not be saddled with what may have been a poor bargain on Transit's part. And, regardless of whether Transit was made whole for its final track removal outlay by the condemnation award following the takeover of its transportation operation,[131] Transit accepted the settlement with full knowledge of the fact that there would be no future ratemaking proceeding in which that expense could be recovered from farepayers. For these reasons, we hold that equity does not require a deduction from the amount of restitution to reimburse Transit for track removal.

In its fourth equitable argument, Transit seeks an offset for the $613,661.28 credited by the Commission to the farepayers' fund at the time of the sale of the Fourth Street

125. *D.C. Transit Sys., Inc.* (Order No. 245), *supra* note 124, 48 Pub.Util.Rep. (PUR) 3d at 395.

126. *Id.* at 397.

127. *D.C. Transit Sys., Inc. v. Washington Metro. Area Transit Comm'n, supra* note 54, 121 U.S. App.D.C. at 388–390, 350 F.2d at 766–768.

128. Resolution of the District of Columbia Council, Exhibit C to Affidavit of Harvey M. Spear, *Democratic Cent. Comm. v. Washington Metro Area Transit Comm'n,* No. 21,865 (D.C. Cir. filed Aug. 10, 1979).

129. Affidavit of Harvey M. Spear, *supra* note 128, at 5 n.*.

130. *D.C. Transit Sys., Inc. v. Washington Metro. Area Transit Comm'n, supra* note 54, 121 U.S. App.D.C. at 390, 350 F.2d at 768.

131. The parties have expended substantial energy in debating the question whether the Washington Metropolitan Area Transit Authority's award of $44,904,960 reimbursed Transit for this expense. See Brief for Petitioner Democratic Central Committee on Transferred Properties at 21–23; Affidavit of Gilbert Hahn, Jr., *Democratic Cent. Comm. v. Washington Metro Area Transit Comm'n,* No. 21,865 (D.C.Cir. filed Sept. 14, 1979); Reply Memorandum of D.C. Transit System, Inc., at 7–9, *reprinted in* Answering Brief for Petitioner D.C. Transit System, Inc., on Properties Market Value Appreciation,

Shop and the Southern Carhouse.[132] We have already considered this claim and upheld it.[133]

■ Finally, Transit argues that it should be permitted to recoup from the farepayers any deficiency that existed in its reserve for injuries and damages at the time its franchise was terminated.[134] A Commission-sponsored study conducted in 1971 found that the reserve had a $1.6 million deficit.[135] Transit contended that since it would have been entitled to recover this deficiency from its farepayers through increased fares, but as a result of the takeover lost the opportunity to do so, it should be allowed an equitable offset of the $1.6 million against the amount of the restitution award.

For much the same reasoning underlying our denial of a recovery for the track-removal expenses, we deny the request for an offset for the deficiency in the reserve for injuries and damages. Since Transit discontinued transportation operations before a new rate order charging the deficiency to farepayers could be considered,[136] we do not know whether the Commission would have adopted the $1.6 million estimate of the deficiency, or whether the Commission would have ordered a fare increase on this account.[137] Transit's asserted right to this offset is thus entirely speculative, and we refuse to engage in the

retroactive ratemaking that its recognition would necessitate.[138] Moreover, the parties disagree, as they did with regard to track-removal expenses, on whether the condemnation award rescued Transit from the reserve deficiency. We reach the same conclusion here that we did before:[139] Transit accepted the condemnation award in the face of a potential deficiency in the reserve, and with full understanding that in all likelihood further recourse against farepayers would be precluded. In these circumstances, we cannot say that the equities preponderate in Transit's favor.

### 4. Interest

BUF and DCC urge us to allow interest on the amount of restitution due the farepayers.[140] Transit concedes that interest on the judgment fixing restitution is appropriate, but contends that prejudgment interest would be unjust and improper.[141] Our task is first to determine the date from which interest should run, and then to consider the rate of interest proper.

■ BUF proposes alternatively three possible sets of "logical dates" from which interest might accrue: the dates upon which the appreciated properties were respectively removed from operation, the dates of improper fare increases, and the date of our decisions in *DCC I* and *DCC*

132. Brief for Petitioner D.C. Transit System, Inc., on Properties Market Value Appreciation at 75–77.

133. See text *supra* at note 61.

134. Brief for Petitioner D.C. Transit System, Inc., on Properties Market Value Appreciation at 77. Self-insured against claims for injuries and damages, Transit maintained a reserve account on its books to record annual deposits and outlays as needed. Affidavit of Harvey M. Spear, *supra* note 128, at 7.

135. The report on this study, prepared for the Commission by Main Larentz & Co., and issued on March 27, 1972, was not made a part of the record in this case. Brief for Petitioner D.C. Transit System, Inc., on Properties Market Value Appreciation at 77 & n. 96.

App. 5. As we have indicated, for present purposes this dispute is irrelevant.

136. Affidavit of Harvey M. Spear, *supra* note 128, at 8.

137. Counsel for Transit informed us at oral argument that the Commission had indicated that it would allow an offset against the next fare increase for the estimated deficiency, but we have found nothing in the record evidence to this effect.

138. See text *supra* at note 118.

139. See text *supra* at note 131.

140. Brief for Petitioner Black United Front on Properties Issues at 55–65; Brief for Petitioner Democratic Central Committee on Transferred Properties at 26.

141. Answering Brief for D.C. Transit System, Inc., on Properties Market Value Appreciation at 32–40.

*II.*[142] Transit contends that interest cannot begin to run until we have determined the precise amount of restitution to be allowed.[143] Since that amount was not fixed in our prior decisions [144]—and is not computed today—Transit says that the obligation to pay interest has not yet matured.

We faced a similar question of entitlement to interest in *Bebchick III.*[145] There we decided that

> the fair and appropriate date from which to accrue interest [is] ... the day on which *Bebchick II* was decided. In that decision the court decided for the first time that Transit had earned excess monies on prior fares which should be paid into the riders' fund—overturning a contrary Commission ruling.[146]

Similarly our *DCC* decisions marked the turning point in the litigation now before us, for we there held for the first time that appreciation in the value of operating properties accruing while they were dedicated to the public service rightfully belonged to farepayers. Although the discussions in those cases did not reach the precise amount of restitution, they did set the maximum to which farepayers would be entitled.[147] Consequently, we hold that interest on the amount of restitution ultimately awarded in this case should run from June 28, 1973, the date of our decisions in *DCC I* and *DCC II.* Interest from that date is fully in order because of the substantial depletion in the value of money wrought by inflation, and the need to forestall unjust enrichment of Transit and to assist the effort to make the farepayers as whole as possible. Since, however, Transit did not know prior to issuance of these decisions that the fares authorized in Orders Nos. 773 and 1052 were improper, we decline to hold it responsible for interest before that date.

We must next determine the rate at which interest should be set, and find that the parties have provided little help on this issue. BUF suggests that we use the Consumer Price Index in order to "give [the farepayers] back today the economic equivalent of what was unlawfully taken from them." [148] DCC urges us to employ "such rate as [we] deem appropriate under the criteria ... announced in *Bebchick III.*" [149] Transit concentrates solely upon its denial of liability for prejudgment interest and fails to recommend any appropriate rate.[150]

In *Bebchick III*, we adopted an interest rate of 7.1 percent for the period from June 28, 1973, to December 19, 1974.[151] This rate, proposed in that proceeding by the Bebchick group, was based upon the Consumer Price Index and the prime rate of a local bank,[152] and we believe that it would be fair and equitable to use that rate in this proceeding as well. December 19, 1974, was the date on which monies now to be used for the farepayers' restitution were deposited in a bank account under judicial

---

**142.** Brief for Petitioner Black United Front on Properties Issues at 56. Although DCC does not discuss the issue of interest at length, it suggests that interest be calculated from the date each property was transferred out of service. See Brief for Petitioner Democratic Central Committee on Transferred Properties at 14, 18.

**143.** Answering Brief for Petitioner D.C. Transit System, Inc., on Properties Market Value Appreciation at 35–37.

**144.** Answering Brief for Petitioners D.C. Transit System, Inc., on Properties Market Value Appreciation at 37.

**145.** *Bebchick III, supra* note 8, 207 U.S.App.D.C. at 168, 645 F.2d at 1093.

**146.** *Id.* (citations omitted).

**147.** The amount of restitution could not exceed the total of excess fares collected as a result of the two illegal fare orders involved. See *DCC I, supra* note 2, 158 U.S.App.D.C. at 46–47, 485 F.2d at 825–826.

**148.** Brief for Petitioner Black United Front on Properties Issues at 62.

**149.** Brief for Petitioner Democratic Central Committee on Transferred Properties at 26.

**150.** See Answering Brief for Petitioner D.C. Transit System, Inc., on Properties Market Value Appreciation at 32–40.

**151.** *Bebchick III, supra* note 8, 207 U.S.App.D.C. at 168, 645 F.2d at 1093.

**152.** *Id.*

control,[153] and in *Bebchick III* we ruled that interest from that date onward should be allowed at the rate earned by the monies in that account.[154] Although no deposit arrangement was made in the *DCC* cases, we think the rate of interest allowed the *Bebchick* group would be appropriate in the case at bar. We are guided in this connection by the American Law Institute's suggestion that "a person owing restitution in money should make restitution as if he had invested the sum so owed."[155] The money in the court-held account is invested conservatively at minimum risk, and we are convinced that the rate may appropriately be adopted here. On remand, the Commission must calculate prejudgment interest accordingly.

### III. COSTS AND FEES

We must now determine who must bear the expenses incurred by the Commission in connection with the remand proceedings already conducted. As we discussed in *Bebchick III*, the Commission initially assessed against Transit the costs in the *Bebchick* and *DCC* disputes, and collected in advance approximately $200,000 from Transit to cover the Commission's expenses on remand.[156] Upon completion of those proceedings, however, the Commission concluded that Transit should bear none of the costs of the remand, and ruled that Transit was entitled to recover not only the $200,-000 previously collected from it for expenses of the Commission but also all of Transit's own expenses.[157] The Commission felt that the remand proceedings were essentially continuations of the prior ratemaking proceedings, the costs of which farepayers are generally required to bear,

and that the expenses on remand should be levied against the farepayers' award of restitution.[158]

In *Bebchick III*, we upheld the initial assessment of the Commission's costs against Transit, but reversed the decision contemplating reimbursement by farepayers for Transit's own costs.[159] We noted that while the Compact permitted the costs of ratemaking to be borne by farepayers, it also provided that "[a]ll reasonable expenses of any investigation, or other proceeding of any nature, conducted by the Commission, of or concerning any carrier, and all expenses of any litigation, including appeals, arising [therefrom] shall be borne by such carrier."[160] Because the remand in *Bebchick III* placed the Commission in a role not envisioned by the Compact—that of special master for the court, not ratemaker—the question of cost allocation was "not one of the Commission's authority but of the court's own judgment."[161] Accordingly, we concluded that the Bebchick group should not bear the expenses of either Transit or the Commission.

An examination of the variant circumstances surrounding the remand in the *DCC* cases, however, leads us to depart from our holding in *Bebchick III* with respect to the Commission's own costs. In *Bebchick III*, we were influenced by the fact that "the remand was largely unnecessary. Transit rejected figures which it later accepted on the remand, and ... part of the Commission's activities did not require any further hearings at all."[162] Here, on the contrary, the immense value of the remand proceedings has been fully proven. The Commission, compliably with our in-

---

**153.** *Id.*

**154.** *Id.* at 168–169, 645 F.2d at 1093–1094.

**155.** Restatement (Second) of Restitution § 28 comment a (Tent.Draft 1983).

**156.** See *Bebchick III, supra* note 8, 207 U.S.App. D.C. at 169, 645 F.2d at 1094.

**157.** Commission's Property Report, *supra* note 27, at 29–30, J.App. vol. 1.

**158.** *Id.*, J.App. vol. 1.

**159.** *Bebchick III, supra* note 8, 207 U.S.App.D.C. at 169, 645 F.2d at 1094.

**160.** Washington Metropolitan Area Transit Regulation Compact, tit. II. art. XII, § 19(a), incorporated into Pub.L. No. 86–794, 74 Stat. 1031, 1047 (1960); *Bebchick III, supra* note 8, 207 U.S.App.D.C. at 169, 645 F.2d at 1094.

**161.** *Bebchick III, supra* note 8, 207 U.S.App.D.C. at 169, 645 F.2d at 1094.

**162.** *Id.*

structions in the *DCC* decisions, hired experts, compiled testimony and exhibits, commissioned studies, analyzed the massive record data and reported meaningfully its findings and conclusions to us. From this heavy investment of Commission time and labor, the farepayers and the court alike have benefited greatly. In keeping with the rationale of *Bebchick III*, we hold that the Commission's costs on the last-conducted remand in these cases are to be paid from the fund for restitution. The exact amount of these costs will have to be calculated by the Commission, as the data before us [163] do not demarcate the expenses in the *DCC* remands from those incurred in the remand from *Bebchick II.*

As to Transit's costs, however, we cannot accept the Commission's conclusion that they too should be paid out of the fund for restitution. Each participant before the Commission has sought to serve its own discrete interests, and we think it equitable to require each to pay its own way. Fairness thus dictates that each should bear its own expenses in connection with the remand.[164]

Finally, we reach an issue of attorneys' fees. Prior to oral argument, we requested fee applications from petitioners,[165] then assuming that today's decision would mark the resolution of all controversies remaining. As still another remand to the Commission is necessary, we deem it best to defer consideration of awards of attorneys' fees until ultimate disposition of these cases by this court. We will request supplemental fee applications at the appropriate time, and we do not ask the Commission to tackle the question of attorneys' fees on remand.

## IV. CONCLUSION

It is with much regret that once more we must remand to the Commission. We are, of course, fully aware of the duration of this litigation, but we lack the data needed for computation of the precise amount of restitution to be awarded to farepayers.

In an effort to minimize confusion and expedite the remand proceedings, we summarize the Commission's remaining tasks. First, in calculating the gain through value appreciation on the Fourth Street Shop and the Southern Carhouse, the actual 1959 selling price must be substituted for the appraiser's estimate.[166] No deduction for a brokerage fee may be allowed,[167] and these properties are to be treated like all others involved for the purpose of estimating capital gains taxes.[168] Second, the capital gains taxes on all properties must be recalculated by resort to the methodology approved in *Bebchick III.*[169] Third, the Commission must ensure that the total amount of restitution does not exceed the total of the fare excesses purportedly authorized by the orders under review in these cases.[170] Fourth, the Commission must reduce the net gain on the Fourth Street Shop and Southern Carhouse by $613,661.28 to compensate for profits already allocated to farepayers,[171] and must subtract $283,869 for cost-of-living expenditures from the total amount of restitution.[172] The Commission must then calculate interest from June 28, 1973, at the rate we have prescribed.[173] Finally, the Commission's expenses on the prior *DCC* re-

---

163. A list of payments made from the fund appears in a letter from William H. McGilvery to Harvey M. Spear (Aug. 14, 1978), *reprinted in* J.App. vol. 5 at 234–236.

164. Cf. *Bebchick III, supra* note 8, 207 U.S.App. D.C. at 169, 645 F.2d at 1094.

165. *Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n,* No. 21,865 (D.C. Cir. Dec. 10, 1934) (order).

166. See Part II(B)(2) *supra.*

167. See text *supra* at notes 79–80.

168. See text *supra* at notes 81–82.

169. See Part II(B)(4) *supra.*

170. See Part II(C)(1) *supra.*

171. See text *supra* at note 61.

172. See Part II(C)(2) *supra.* Deduction of these amounts prior to calculation of interest on the amount of restitution renders calculation of interest on the amounts subtracted unnecessary.

173. See Part II(C)(4) *supra.*

mands, as well as those on the remand we order today, must be subtracted from the restitution award.[174]

When the remand proceedings are completed, the Commission will report the results to this court. At that time, the court will entertain any objections to the proceedings on remand, suggestions for distribution of the restitutionary fund, and applications for attorneys' fees.

*So ordered.*

MacKINNON, Senior Circuit Judge (dissenting in part and concurring in part).

My dissent in this case is compelled by my conclusion that the majority, under the guise of restitution, has exceeded its jurisdiction and engaged in prohibited retroactive ratemaking in stretching a valid restitutionary award of $738,720 with respect to one invalid rate order, into an award of $2,605,588 that is based upon the alleged invalidity of several valid rate orders whose validity was never attacked by an action. Interest to run on both awards for approximately fifteen years. In my opinion restitutionary awards must be based only on particular rate orders that courts with jurisdiction have declared to be unjust and unreasonable.

I thus dissent to much of Part II of the majority opinion, entitled "Property Issues." In this Part, the court treats (1) the Commission's identification of properties converted from operating to non-operating status, (2) the Commission's computation of the amount of value appreciation of such properties, and (3) the extent to which that amount should be shared by farepayers. My inability to join in this Part of the court's opinion is based on my conclusion that its calculation of the amount of restitution is largely in conflict with established law. My disagreement springs from two principal sources. First, it is my opinion that the court's *method* of calculating restitution is fundamentally flawed. Second, the *period of time* during which the invalid fares are deemed to have been in effect for the purpose of awarding restitution is in contradiction of the statutory procedures required to invalidate ordered fares and is incorrect. These two objections are treated in turn. Finally, there is a third area in which I differ from the proposed disposition by the majority: the denial of four of five claims made by Transit for equitable adjustment in the amount of restitution to be awarded.

I concur in Parts I and III of the majority opinion dealing, respectively, with the efficiency and viability of D.C. Transit System, Inc. ("Transit") and the awarding of fees and costs, which correctly state the governing law. Part I affirms the finding of the Washington Metropolitan Area Transit Commission ("Commission") that Transit was sufficiently viable and efficient in 1970 to be entitled to the benefit of a fare increase.[1] In Part III, the court upholds reimbursement of the Commission for its

---

**174.** See Part III *supra.* The expenses of today's remand should initially be assessed against Transit if an interim assessment is required. Later deduction of the Commission's expenses from the amount of restitution will reimburse Transit.

**1.** The majority opinion arrives somewhat late at this correct assessment of the efficiency and viability of Transit. *See Democratic Central Comm. v. Washington Metro. Area Transit Comm'n ("DDC II"),* 485 F.2d 886, 915 (D.C.Cir. 1973) (MacKinnon, J., concurring in part and dissenting in part), *cert. denied,* 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974) (arguing "past management was perhaps not as inefficient as has been contended...."). On remand, the Commission, supported by independent expert study, came to the same conclusion. *See* "Report of the Commission on the Issues of 'Effi-

ciency' and 'Viability,'" *In re: Remands from the United States Court of Appeals for the District of Columbia of D.C. Transit System, Inc.* (Aug. 31, 1981) at 9–13, 40 (upholding Hearing Officer's 448–page report finding that Transit was efficient and viable in 1970); "A Financial Analysis of D.C. Transit System, Inc. (District of Columbia) and Subsidiaries as of April 15, 1970," *reprinted in* Appendix to Brief for Petitioner Black United Front on Viability and Efficiency Issues ("Laconto Report").

The majority's validation of the Commission's finding of efficiency and viability mandates that, insofar as that issue is involved, the fare increases approved by Order 1052 were fair and reasonable, and are not subject to inclusion in the restitutionary calculation. *See infra* note 12.

expenses in connection with our remand, holds that all other parties must bear their own costs, and defers consideration of petitioners' applications for attorneys' fees.

## I. Method of Calculating Restitution— Allocation of Gain

It is my conclusion that the majority incorrectly allocates to farepayers the gain on *nondepreciable* assets when transferred out of service. Such allocation contravenes: the express statutory language of the Washington Metropolitan Area Transit Regulation Compact (the *"Compact"*),[2] which provided for Transit's franchise to operate a mass transportation system in the metropolitan area; relevant case law of this and other courts; and traditional principles of public utility regulation. The decision of the majority ignores the principles that: a) depreciable and nondepreciable assets are to be treated differently; and b) investors are entitled to recover a fair rate of return on their risk-incurring investment.

In rejecting the argument that ratepayers were not entitled to share in any portion of the proceeds of the sale of corporate assets unless there was a profit on the *depreciable* portion of the assets sold, the majority fails to recognize that the Compact itself provided that investors, having undertaken a risk of loss, would be entitled to recover a return on their investment, to-wit:

> It is hereby declared as a matter of legislative policy that in order to assure the Metropolitan District of an adequate transportation system operating as private enterprises the carriers therein, in accordance with standards and rules prescribed by the Commission, should be afforded the opportunity of earning such return as to make the carriers attractive investments to private investors. As an incident thereto, the opportunity to earn a return of at least 6½ per centum net

after all taxes properly chargeable to transportation operations, including but not limited to income taxes, on gross operating revenues, shall not be considered unreasonable.

*Compact,* at 1040–41. This declaration adopted, nearly verbatim, the language used by Congress in 1956 in the Act granting Transit a franchise to operate a mass transportation system in the Washington metropolitan area. *Public Law 757, ch. 669, 70 Stat. 598–99, 49 U.S.C. 27 et seq. (84 Cong., 2d Sess., July 24, 1956) ("Franchise Act").* The Franchise Act contained the additional policy declaration that "Congress will maintain a continuing interest in the welfare of the Corporation and its investors." 70 Stat. at 599.

In fact, one of the cases cited earlier in this litigation, *City of Lexington v. Lexington Water Co.,* 458 S.W.2d 778 (Ky.1970),[3] explicitly rejected any crediting of profits to consumers and held such profits belonged to shareholders. In that decision, the Kentucky Supreme Court held that the risk of capital gain or loss fell on investors' shoulders, and, in a precise holding, concluded that:

> [p]rofit made from the sale of *non-depreciable land* no longer used in serving customers is not an ingredient to be considered in fixing rates. The customers had no interest in the profit realized on the sale—it belonged to the stockholder.

*Id.* at 780 (emphasis added). This ruling in *Lexington Water Co.,* as we noted in *Democratic Central Committee v. Washington Metro. Area Transit Comm'n ("DCC I"),* 485 F.2d 786, 797 n. 82 (D.C.Cir.1973), *cert. denied,* 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974), explicitly relied on the United States Supreme Court's emphatic declaration on the risk allocation issue in *Board of Pub. Util. Comm'rs v. New York Telephone Co.,* 271 U.S. 23, 46 S.Ct. 363, 70 L.Ed. 808 (1926):

**2.** Washington Metropolitan Area Transit Regulation Compact (*"Compact"*), tit. II, art. XII, § 6(a)(3), *incorporated into* Pub.L. No. 86–794, 74 Stat. 1031 (1960).

**3.** Cited in *Democratic Central Committee v. Washington Metro. Area Transit Comm'n ("DCC I"),* 485 F.2d 786, 796–97 (D.C.Cir.1973), *cert. denied,* 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974).

Customers pay for service, not for the property used to render it. Their payments are not contributions to depreciation or other operating expenses or to capital of the company. By paying bills for service they do not acquire any interest, legal or equitable, in the property used for their convenience or in the funds of the company.

*Id.* at 32, 46 S.Ct. at 266.

*New York Telephone* has been consistently adhered to. To the same effect is *Fed. Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944) (review of rate orders necessarily requires a "balancing of the investor and the consumer interests"). A few years later, in *Washington Gas Light Co. v. Baker,* 188 F.2d 11 (D.C.Cir.1950), *cert. denied,* 340 U.S. 952, 71 S.Ct. 572, 95 L.Ed. 686 (1951), this court articulated a "zone of reasonableness within which rates may properly fall ... bounded at one end by the investor interest against confiscation and at the other by the consumer interest against exorbitant rates." *Id.* at 15.[4] Recently, this court followed these precedents closely in mandating a "reasonable balancing" of investor and consumer interests in a utility rate dispute. *Jersey Central Power & Light Co. v. Fed. Energy Reg. Comm'n,* 810 F.2d 1168 (D.C.Cir.1987). The present decision thus appears to represent an abrupt *volte-face,* abandoning the principle that allocation of gain on *non*depreciable assets will *not* depend on whether consumer or investor bears the risk. Investors *necessarily* bear that burden.

It has long been standard practice in utility cases to allocate gain or loss on nondepreciable assets to investors, rather than to consumers, since the concept of obsolescence applies only to depreciable property, not to land.[5] Customers have no interest in profits on dispositions of land, since they make no contribution to capital cost and have therefore not reimbursed investors for their capital outlay. Hence, such dispositions are only a concern for investors, and are not an ingredient in rate-making.[6]

Moreover, as this court conceded in *DCC I,* the "uniform result" of administrative decisions within the District of Columbia has been to allocate gain on disposition of nondepreciable assets to investors. 485 F.2d at 795. Hence, the present majority not only flouts traditional accounting methods,[7] but also rejects the unanimous decisions of expert regulatory agencies that have specifically relied on the Supreme Court's decision in *New York Telephone.* The majority opinion thus blazes its own trail, a trail unlikely to be followed by courts more attentive to the principle that reasonable and rational administrative agency decisions will not be overturned simply because a majority of the division feels that equity would be better served by a different disposition, or that they themselves would have reached a different con-

**4.** *See also DCC I,* 485 F.2d at 831 (MacKinnon, J., concurring in part and dissenting in part).

**5.** *See DCC I,* 485 F.2d at 834–37 (MacKinnon, J., concurring in part and dissenting in part); *see also Re D.C. Transit System, Inc.* (Order No. 245), 48 P.U.R.3d 385, 399–400 (Wash. Metro. Area Transit Comm'n 1963).

**6.** The principle of legitimate investor interest in a fair rate of return on investment is also well-established in the scholarly literature. *See e.g.,* Bonbright, *Principles of Public Utility Rates* (1961); E. Gellhorn & R. Pierce, *Regulated Industries in a Nutshell* 134–44 (1987); E. Nichols, *Ruling Principles of Utility Regulation: Rate of Return* 47–48 (1955).

**7.** Quite apart from the depreciable/nondepreciable distinction, it should be noted that the Opinion's preference for the "book-to-market" method of calculating gain allocable to farepayers (Maj. op. at 411), as opposed to the "market-to-market" method (which would require subtraction of market value on date of first operation from market value at time of transfer), is open to question. Although I feel constrained to concede that (as the majority notes) our instructions to the Commission in *DCC I,* 485 F.2d at 827, and *DCC II,* 485 F.2d at 914, effectively directed calculation according to the former method, further reflection indicates that the latter method may better accord with investors' entitlement to the benefit of their bargain and also provide a better approximation of real value, since book value is usually a poor indicator of an item's worth. *See generally* G. Johnson & J. Gentry, *Finney's Principles of Accounting,* 367, 372 (8th ed. 1980).

clusion.[8]  Under well-established precedents, courts must determine only whether the administrative action was so improper as to fall outside a broad "zone of reasonableness"—so unreasonable as to constitute an abuse of discretion.[9]  Here, the Commission made a reasonable allocation with respect to nondepreciable assets, and therefore there is no legal basis upon which to overturn it.

Assuming, arguendo, that gain realized on nondepreciable assets *should* accrue to farepayers, it would still constitute error to order that the invalidity of Order 773 continued beyond the termination date of that order.  Rising costs of operation, inflationary pressures, and other socio-economic forces too complex to quantify would have combined to make the fare hikes represented by the post–773 rate orders necessary, inevitable and valid.  Indeed, the Commission's findings accompanying the promulgation of each new rate reflect this fact.  Any small difference in Transit's operating capital resulting from depriving investors of their gain on land would not likely have resulted in the lower fares that the majority seems to assume would have resulted.  If these economic realities were not the case, it is difficult to understand why no farepayer contested the increases in rates fixed by the orders which followed Order 773.  In this connection, it should be noted that the holding of the majority on the land value appreciation issue constitutes an attack on Orders 773 and 1052 that was never made against the intervening fare orders.  *See infra* Part II.B.

## II.  THE PERIOD FOR CALCULATING RESTITUTION

The second—and even more important—area in which, in my opinion, the majority errs, is in its determination of the *period* that should be covered by the restitutionary award, i.e., artificial extension of Order

773 beyond its effective period.  The majority correctly begins the restitution period with the complete period that Order 773 (invalidated in *DCC I*) fixed D.C. fares; but then continues that period without interruption far beyond the date that Order 773 was terminated by superseding orders.  In this respect, the majority rules that the fare fixed by Order 773 on January 26, 1968 continued, *for the purpose of awarding restitution for the next seven years*— until January 14, 1973 when Transit was taken over by eminent domain.  The effect of such decision is to decide retroactively— some fourteen years after the last fare order—that three successive fare orders issued after Order 773 were invalid, even though a fourth order, Order 1052, was the only one of the superseding fare orders that was challenged by farepayers.  This treatment, which assumes the continuing invalidity of the fare increase authorized by Order 773, is erroneous on several grounds.  Before demonstrating the soundness of this point and the error of continuing the invalidity beyond the effective date of the order, it is desirable to outline briefly the ratemaking background being dealt with.

### A.  Background of Rate Orders

Prior to January 26, 1968, basic rates for mass transportation in the District of Columbia had been set at a cash fare of 25 cents and a token fare of four for 98 cents.  Transit applied to increase these fares to 30 cents each and four tokens for $1.10.  In Order 773, issued January 26, 1968, the Commission rejected this request, but allowed a 2 cent increase, to 27 cents cash fare and four tokens for $1.00.[10]  In *Powell v. WMATC*, 485 F.2d 1080 (D.C.Cir.1973), this court substantially affirmed the Order.

However, in *DCC I*, decided the same day as *Powell* (June 28, 1973), we reviewed a different aspect of Order 773.  In *DCC I*, the court held that, in promulgating Order

---

8. *See DCC I*, 485 F.2d at 833, 845–47 (MacKinnon, J., concurring in part and dissenting in part); *see also Southern Natural Gas Co. v. Fed. Energy Reg. Comm'n*, 813 F.2d 364, 369 (11th Cir.1987).

9. *See, e.g., In re Permian Basin Area Rate Cases*, 390 U.S. 747, 767, 791, 88 S.Ct. 1344, 1360, 1372, 20 L.Ed.2d 312 (1968); *Public Serv. Comm'n v. Econ. Reg. Admin.*, 777 F.2d 31, 36 n. 6 (D.C.Cir. 1985).

10. 72 P.U.R.3d 113, 158 (WMATC 1968).

773, the Commission erred in refusing to allocate to farepayers, as an offset to higher fares, the appreciation in value (the excess of market value over book value) of properties when transferred from operating to non-operating status. We declared Order 773 invalid to that extent, and ordered restitution, in an amount to be determined by the Commission on remand.

*Prior* to the issuance, in 1973, of our decision in *DCC I*, however, a number of *other* superseding rate orders had been promulgated by the Commission. On October 18, 1968, the Commission issued Order No. 882 (unreported), setting rates at 30 cents/cash fare, 26¼ cents/token fare (min. purchase of 4). No court challenge was brought against this Order.

On Dec. 23, 1968, the Commission issued Order No. 900 (unreported), setting rates at 30 cents cash fare and 30 cents token fare (minimum purchase of 4). No court challenge was brought against this Order either.

On October 24, 1969, the Commission issued Order No. 984,[11] rejecting Transit's requested rates of 32 cents cash fare, 32 cents token fare as excessive, but declaring Transit entitled to a fare increase nonetheless, with fares to be set at a "just and reasonable level." No farepayers challenged this Order. *Transit,* however, petitioned for review. In *DC Transit System Inc. v. WMATC,* 485 F.2d 881 (D.C.Cir. 1973), we held that the Commission had not given proper consideration to the higher labor costs, attributable to increases in the cost of living, which Transit faced. We held Transit entitled to fare increases to the extent such heightened costs made increases necessary, and remanded to the Commission for computation.

11. 81 P.U.R.3d 417 (WMATC 1969).

12. It should be emphasized that (subject to the validity of my objection to the majority's decision with respect to the allocation of gain on land) no part of this Court's restitutionary award in this case should be construed to compensate farepayers for overcharges allegedly imposed by Order *1052.* This follows from the majority's conclusion (Maj. op. at 405–407) that, on remand, the Commission correctly found Transit to be efficient and viable in 1970 and thus recognized the valid basis for Order 1052

Finally, on June 26, 1970, the Commission issued Order No. 1052 (83 P.U.R.3d 1), authorizing Transit to increase its fares to: 40 cents/cash fare, 40 cents/token fare (minimum purchase: four tokens). Farepayers did challenge this Order and, in *Democratic Central Comm. v. Washington Metro Area Transit Comm'n ("DCC II"),* 485 F.2d 886 (D.C.Cir.1973), *cert. denied,* 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed. 2d 493 (1974), we set aside the Order on the ground that the Commission had failed to take into account both the increase in the value of Transit's land and Transit's alleged inefficiency. Nevertheless, by June 28, 1973 when our decision in *DCC II* was rendered, a public authority had already acquired Transit by eminent domain. We therefore remanded to the Commission for computation of the restitution award.

It is only with an understanding of this protracted history that we may compute the restitution due farepayers. In light of the foregoing progression of rate orders, the amount of restitution that should be awarded as compensation should be limited to the excessive fares exacted during the period that Order 773 was in effect, and *not*—as the majority holds—for fares exacted during periods in which other superseding fare orders, duly promulgated by the Commission, and prima facie valid and never challenged by farepayers, were in operation.[12] An examination of the law on retroactive ratemaking demonstrates the particular defects of the computation by the majority.

B. *Reasonable Rates and the Prohibition of Retroactive Ratemaking*

Part II.C.1. of the majority's opinion (entitled "Amount of Restitution Available in

that the court had found lacking in *DCC II,* 485 F.2d at 913. As the Opinion notes:

> The Commission thus has cured its neglect of Transit's efficiency and viability when it promulgated Order No. 1052 by investigating and determining those matters on remand. It follows that Transit's farepayers are *not* entitled to any restitution on the now-refuted theory of a lack of efficiency or viability on Transit's part in 1970.

Maj. op. at 407 (emphasis added).

*DCC I*")[13] rejects Transit's argument that restitution be limited to $738,720, the aggregate of overcharges collected during the 277 days in which the fare hike allowed by Order 773 was in effect before it was invalidated by *DCC I*. Despite the fact that Order 773 was superseded by several subsequent fare orders which either were never challenged by any farepayer (Orders 882, 900, and 984) or were authorized by the Commission despite farepayer challenge (Order 1052), the majority adopts the Commission's recommended restitutionary award of $2,605,588. This sum represents "the fare increment authorized by Order No. 773 over the remainder of Transit's life as a public utility"[14] as though the subsequent unchallenged orders were automatically invalid. And whatever amount is awarded as restitution it would be increased by high interest computed from 1973—15 years—a stupendous sum.

The majority argues that Order 773 served as a "base fare"[15] as to which all subsequent rate orders were "incremental."[16] There is a strong body of statutory and decisional authority arguing against the retroactive ratemaking which the majority's opinion would create. Neither statutory nor decisional law countenances backward-looking revision of new, effective rates based on a prior judicial invalidation of an earlier rate—retroactive ratemaking. The majority argues that its conclusion "does not disturb any authorization of an additional fare increase following Order No. 773, and thus raises no issue of preclusion or due process...."[17] However, that is exactly what the automatic application of the invalidity of Order 773 to all subsequent unchallenged fare orders, for restitution purposes, does do.

Both statutes and case law provide considerable authority against the "base fare/rate increment" approach which the majority, flouting due process, takes here.

## 1. *Statutes*

There are three statutory schemes relevant here, each of which are violated by the majority: (a) D.C.Code Title 43 (the public utility law for the District of Columbia); (b) D.C.Code Title 12 (the relevant statute of limitations); and (c) Public Law 757, Ch. 669, 70 Stat. 598, 49 U.S.C. 27 et seq. (July 24, 1956) (granting a franchise to D.C. Transit System, Inc.).

### (a) *D.C.Code Title 43.*

Several provisions of the District of Columbia Code direct *prospective* ratemaking.

i) D.C.Code § 43–701 (1967) provided:

All public utilities to which an order of the Commission applies shall make such changes in their schedules on file as may be necessary to make the same conform to said order, and no change shall thereafter be made by any public utility in any such rates, tolls, or charges, or in any joint rate or rates, without the approval of the commission. Certified copies of all other orders of the commission shall be delivered to the public utility affected thereby in like manner, and the same shall take effect within such reasonable time *thereafter* as the commission shall prescribe.

(Codified at D.C.Code § 43–901 (1981) (emphasis added)).

ii) D.C.Code § 43–702 (1967) provided:

*The commission may*, at any time, upon notice to the public utility and after opportunity to be heard as provided in section 43–410 [now § 43–610], *rescind, alter, or amend any order fixing any rate* or rates, tolls, charges or schedules, or any other order made by the commission, and certified copies of the same

---

**13.** *Id.* at 415–16.

**14.** *Id.* at 416.

**15.** *Id.* at 415.

**16.** *Id.* at 416, n. 105 (*quoting* Report of the Hearing Officer, In re Remands from the United

States Court of Appeals for the District of Columbia Circuit of D.C. Transit Sys., Inc. (Feb. 17, 1978), at 26).

**17.** *Id.* at 416.

shall be served and *take effect as herein provided for original orders.*

(Codified at D.C.Code § 43–902 (1981) (emphasis added)).

iii) D.C.Code § 43–703 (1967) provided:

*All rates,* tolls, charges, time and condition of payment thereof, schedules, and joint rates fixed by the commission *shall be in force and shall be prima facie reasonable until finally found otherwise in an action brought for that purpose.*

(Codified at D.C.Code § 43–903 (1981) (emphasis added)).

This required that an "action [be] brought" to set aside fare orders. Declaring a "rate" invalid without such action is a plain denial of due process.

### (b) *D.C.Code Title 12 (Limitation of Actions).*

In the absence of a more specific statute of limitations, the catch-all provision of the D.C.Code requires that any attack on a rate must be brought within three years. D.C. Code § 12–301 (1981) provides:

Except as otherwise specifically provided by law, actions for the following purposes may not be brought after the expiration of the period specified below from the time the right to maintain the action accrues....

... (8) for which a violation is not otherwise specifically prescribed—three years....

### (c) *Public Law 757, Ch. 669, 70 Stat. 598, 49 U.S.C. 27 et seq. (84th Cong., 2d Sess., July 24, 1956) ("Franchise Act").*

This Act provides:

The initial schedule of rates ... shall continue in effect until August 15, 1957, and thereafter until superseded.... Whenever on or after August 15, 1957, the Corporation files with the Commission a new schedule of rates, such new schedule shall become effective on the tenth day *after* the date of such filing, unless the Commission suspends the operation of such new schedule.... If the Commission suspends such new schedule it shall immediately give notice of a hearing ... and, *after* such hearing ... shall determine and by order fix the schedule of rates to be charged by the Corporation. If the Commission does not enter an order, to take effect at or prior to the end of the period of suspension ... the suspended schedule filed by the Corporation may be put into effect by the end of such period, and shall remain in effect until the Commission has issued an appropriate order based on such proceeding.

70 Stat. at 599 (emphasis added). Hence, under the Congressional Act which granted Transit its franchise to operate a mass transportation system in the Washington metropolitan area, fares are presumed to be reasonable upon their effective date, and supersede earlier fares. Moreover, the Compact itself states that, with respect to judicial review of fare orders, "[t]he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." *Compact,* 74 Stat. at 1046.

Taken together, these provisions evidence legislative intent to permit only prospective ratemaking, and to *bar retroactive ratemaking.* They offer a clear statutory direction that rate increases become effective "after" issuance of the Commission orders authorizing them. The majority's approach would doom the Commission to an unceasing game of catch-up—especially difficult in periods of heavy inflation such as the period in which this litigation arose—in its attempt to achieve a proper rate based on both consumer needs *and* its own costs. The statute of limitations provision, moreover, compels the conclusion that, since the rate orders issued between Order 773 and Order 1052 were never challenged "in an action" (*see* D.C.Code § 43–703) by farepayers during the prescribed three year period, each of those orders must be deemed valid for the entire period during which they were in effect. The operation of none of these orders was ever *suspended* and hence under the statute continued to be "effective" until superseded by a subsequent order.

430

## 2. *Decisional law*

There is a substantial body of decisional law affirming the presumptive validity of duly adopted rate orders and barring retroactive revision of such orders. Several courts have dealt with superseding rate orders, and courts have refused to return to the first in a series of rate orders and treat it—as the majority does here—as an ongoing base rate upon which all subsequent rates were built. Each order is based on a separate showing and determination as to reasonableness, and hence must be evaluated individually.

*Board of Public Utilities Comm'rs v. New York Tel. Co.*, 271 U.S. 23, 46 S.Ct. 363, 70 L.Ed. 808 (1926) furnishes a good example. In that case, the Supreme Court upheld a temporary injunction restraining the enforcement of telephone rates since the utility *"could not be compelled to make up deficits in future net earnings out of the depreciation reserves accumulated in the past."* [18] The Court, in barring retroactive ratemaking such as the majority sanctions here, went on to stress that "the law does not require the company to give up for the benefit of future subscribers any part of its accumulations from past operations. *Profits of the past cannot be used to sustain confiscatory rates for the future."* [19]

Twenty years later, in *United States v. Public Utilities Comm'n*, 158 F.2d 533 (D.C.Cir.1946), *cert. denied*, 331 U.S. 816, 67 S.Ct. 1305, 91 L.Ed. 1835 (1947), this court faced the issue of the presumptive validity of superseding rate orders even more directly than the Supreme Court had

in *New York Telephone. Public Utilities Comm'n* upheld a rate order against a Government petition which asserted that the rate invalidly permitted some $29 million in excess profits collected under a *prior rate* to remain as an element in the rate base. The court expressly refused to undertake the backward-looking review that the majority undertakes here, observing:

[T]his court would be undertaking a wrongful invasion of the regulatory territory properly reserved for the Public Utilities Commission if we were to say ... that a high return on the common stock equity is, in and of itself, ample reason for retrospectively holding invalid rate schedules authorized by the Commission over a course of many years. It is only by saying retroactively that the rates extracted in former years were not "just and reasonable", that we can conclude that the surplus of undistributed earnings was an unlawful accumulation which could not be devoted to the public service in such a fashion as to warrant allowing the Company to earn a return on it.

*Id.* at 535. The court also held that even if the Company had been less vigilant than it might have been in protecting consumer interests, superseding rate orders, if "just and reasonable" within a broad ambit of discretion, would not be disturbed by a reviewing body. *Id.* at 536. "High profits and just rates," wrote the court, "are not prima facie incompatible." *Id.* The court went on to examine a pattern of ratemaking and order-by-order proceeding strikingly similar to the pattern evidenced by the

---

**18.** 271 U.S. at 28, 46 S.Ct. at 364 (emphasis added).

**19.** *Id.* at 32, 46 S.Ct. at 366 (emphasis added); *see also Federal Power Comm'n v. Colorado Gas Co.*, 348 U.S. 492, 501, 75 S.Ct. 467, 472, 99 L.Ed. 583 (1975) ("it is not the function of a court itself to engage in ratemaking"); *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 618, 64 S.Ct. 281, 295, 88 L.Ed. 333 (1944) ("He who would upset the [FPC] rate order under the [Natural Gas] Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences...."; at the same time, *the Commission had no power to make reparation*

*orders or to fix past rates*); *Federal Power Comm'n v. Natural Gas Pipeline Co.*, 315 U.S. 575, 590, 62 S.Ct. 736, 745, 86 L.Ed. 1037 (1942) (constitutional challenge to Natural Gas Act; "regulation does not insure that the business shall produce net revenues, nor does the Constitution require that the losses of the business in one year shall be restored from future earnings by the device of capitalizing the losses and adding them to the rate base on which a fair return and depreciation allowance is to be earned."); *cf. United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 421–22, 86 S.Ct. 1545, 1559–60, 16 L.Ed.2d 642 (1966); (res judicata bar to reopening settled matters).

rate orders of the Commission in this case, and concluded:

> [T]hroughout the many years during which the sliding scale arrangement has been in effect, the rates have been *excessive and illegal. Each year, however, the rates were fixed by an order of the Commission.... The annual orders which fixed the rates became firm and conclusive when no person affected thereby availed himself of the right of appeal.* Consequently the rates so fixed became the legal rates for the periods during which they were to endure, and neither the United States nor any other party affected thereby can brand them as illegal.

*United States v. Public Utilities Comm'n,* 158 F.2d at 537–38 (emphasis added). This earlier decision of our court applies here. It has never been overruled or criticized, and squarely contravenes the restitutionary approach of the majority.[20]

Even more importantly, in *Williams v. Washington Metro. Area Transit Comm'n,* 415 F.2d 922 (D.C.Cir.1968), this court applied the principles developed in the aforementioned cases to the specific Commission involved in the present dispute. In a lengthy opinion, this court invalidated two Commission orders, Order No. 245 and Order No. 563. However, noting that those orders had been superseded by subsequent Commission rate orders, the court declined to remand for further consideration. *Id.* at 939–41. The decision states:

The propriety of another remand thus hangs on the Commission's power to devise a new order, *nunc pro tunc,* governing the years intervening between Order No. 245 and the entry of a subsequent order prescribing the "lawful fare ... to be in effect." The Commission, however, possesses no authority to fix rates for the past. An order prescribing the lawful fares to be charged by a public utility, being essentially legislative in character, ordinarily speaks only for the future. And we find nothing in the statutory provisions governing the Commission's regulatory responsibilities that indicates an intent to depart from this "customary pattern of fixing rates prospectively." Hence, we conclude that the Commission lacks power to enter a new rate order in this proceeding, and that a remand for further consideration is not called for.[21]

Having ruled out remand as a remedial step, the court in *Williams* turned to the formulation of a restitutionary award. However, quite unlike the approach of the majority here, the court, invoking venerable principles of equity, adopted a flexible, rather than a maximalist, approach to restitution:

> Since restitution is not a matter of right, but is *"ex gratia,* resting in the exercise of sound discretion," it lies within our authority to direct restitution in an amount less than the whole sum of the increased fares collected under the invalid order, or to deny it altogether, if com-

---

20. *See also Washington Gas Light Co. v. Baker,* 188 F.2d 11, 21 & n. 43 (D.C.Cir.1950), *cert. denied,* 340 U.S. 952, 71 S.Ct. 572, 95 L.Ed. 686 (1951) ("We recognize that the *legality of past rates may not be challenged,* and that *past excessive earnings belong to the Company* just as past losses must be borne by it.") (emphasis added); *Public Service Comm'n of New Hampshire v. FERC,* 600 F.2d 944 (D.C.Cir.1979) (barring FPC from approving retroactive rate increases); *Goodman v. Public Service Comm'n,* 467 F.2d 375 (D.C.Cir.1972) (order establishing fair rate of utility return was final order subject to review even though superseded by later orders); *Payne v. Washington Metro Area Trans. Comm'n,* 415 F.2d 901, 910 (D.C.Cir.1968) ("established ratemaking principle[s] ... preclude[ ] a utility from charging higher fares in the future in order to recoup past losses"); *TWA v. C.A.B.,* 385 F.2d 648 (D.C.Cir.1967); *City of Chicago v. FPC,* 385 F.2d 629 (D.C.Cir.1967); *Gas Service Co. v. FPC,* 282 F.2d 496 (D.C.Cir.1960); *Memphis Light, Gas & Water Div. v. FPC,* 250 F.2d 402 (D.C.Cir.1957); *cf. Greater Boston Television Corp. v. F.C.C.,* 463 F.2d 268, 291, *cert. denied,* 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972) (res judicata bar to retroactive proceeding).

21. 415 F.2d at 940–41 (citations omitted). The opinion cited (*id.,* at 941 n. 95) *Washington Gas Light Co. v. Baker,* 195 F.2d 29, 35 (D.C.Cir. 1951), in which this court held that "[r]emand to the Commission, in the circumstances of this case, could not be to enable a rate order to be superimposed upon the old application...."

pelling equitable considerations so dictate.

*Id.* at 944 (citations omitted). Thus, also in contrast to the instant case, the court chose, in *Williams,* to award only partial restitution, holding that "it would be unfair to order Transit to restore the full amount it realized under the invalid fare increase." *Id.* at 945. And, unlike the majority here, the court was highly sensitive in *Williams* to the substantial effect the intervening time might have on the validity of rate orders and the error inherent in perpetuating one determination of invalidity far beyond its effective period:

> [W]e are confronted by circumstances indicating a substantial probability that it would be inequitable to compel Transit to restore the entire amount it realized from the fare increase.... We could not permit the Commission's latter conclusion to control the amount of restitution now to be ordered, since it was based on a record reflecting conditions in years later than the period relevant here, and it did not purport to be a determination of a fair return for the years with which we are concerned.... *[W]e are unable to see how any proper resolution of the matter of restitution in the circumstances presented could ignore the reality of Transit's financial experience during the years in question.*

*Id.* at 944–46 (citations omitted; emphasis added). Ultimately, the *Williams* court decided to "compel Transit to restore the amount realized by the fare increase only to the extent that its actual return [was] not reduced to an amount which all parties have agreed would be unreasonably low." *Id.* at 946. Transit was therefore permitted to retain "any portion of the higher fares necessary to preserve its actual earnings during the years in question at the level conceded by the protestants to represent a fair return." *Id.* Although, concededly, the Commission here has not been as hospitable to Transit's claims as the protestants in *Williams* apparently were, the decision of the majority to completely jettison the subtle approach of the court's earlier equitable opinion is not logically tenable.

In several recent cases involving the precise D.C.Code provisions applicable here, the D.C. Court of Appeals has also barred the type of retroactive utility ratemaking which the majority orders here. In the interest of brevity, one example will suffice. In *Potomac Elec. Power Co. v. Pub. Serv. Comm'n,* 380 A.2d 126 (D.C.App. 1977), reviewing a utility's petition to set aside a Public Service Commission rate order as confiscatory, the D.C. Court of Appeals emphasized both the limited scope of its authority to review Commission orders and the solicitude afforded utilities which increase rates to match costs and earn a fair rate of return. *Id.* at 131–32.

More importantly, the court rejected the idea that a rate could remain applicable for any period beyond that for which it was effective by its terms, holding that "a valid test period [for forecasting rate requirements] must be based on the utility's most recent actual experience, with adjustments for all known changes affecting costs and revenues for the immediate future." *Id.* at 133. The decision recognized very coherently the principle, ignored or forgotten by the majority, that superseding rates are often very different animals than their predecessors, and respond to a wide array of costs, needs and circumstances that are different and newly developed. Hence, in holding that earlier rates were no longer viable and that higher charges were merited, the D.C. Court of Appeals held:

> It is well settled that the rate maker may not rely on out-of-date information when more recent actual experience, which shows a substantial disparity between the earlier forecasts and the rate of return actually earned, is available.... Suitable adjustments must be made to accommodate the latest available relevant data....

*Id.* at 134 (citation omitted).

With respect to relief, the court ordered that "the Commission ... place itself in a position to provide the rate relief it legally was bound to give *at the time* of its [earlier order].... To do otherwise would be to give *perpetual legal effect* to an unlawful order, and to unnecessarily and unwarrant-

edly penalize Pepco, its investors, and indeed its customers for the passage of time necessitated by appellate review of that unlawful order." *Id.* at 148 (emphasis added). It is this principle of *separating the period of one rate order from another* that the majority refuses to observe.[22] In lieu thereof, the majority creates a "rate base" theory out of whole cloth and notwithstanding the provision of the applicable statute that the superseding orders establishing rates here are "prima facie reasonable," the court applies a "rate base theory" that perpetuates an invalid order *ad infinitum* through all the superseding rate orders. D.C.Code § 43–703 (1967). The majority ignores the fact that the *nunc pro tunc* invalidation of Order 773 does *not* mean that superseding rate orders, duly adopted as reasonable adjustments on the basis of "the latest available operating data," [23] are merely incremental to the earlier order and therefore invalid. Rather, the superseding orders are independent successor rate determinations that are "prima facie reasonable" (*id.*) and hence valid until the contrary is found in a due process "action"—a presumption which ratepayers only challenged in one subsequent case, and then only with partial success.[24]

One final case which the majority fails to even mention, despite its widespread citation as authority against retroactive ratemaking, merits attention here. In *Commonwealth v. Old Dominion Power Co.,* 184 Va. 6, 34 S.E. 364 (1945), a suit by purchasers of electrical energy against a utility for refund of overcharges, the Virginia Supreme Court was faced, as this court is faced today, with superseding rate orders.[25] The court held that the Commission was without authority "to put into effect, retroactively, reduced rates applicable to petitioners, and require the power company to refund to them the overcharges collected of them." 34 S.E.2d at 366. Applying state laws similar to the D.C.Code provisions applicable here, the court affirmed that ratemaking could be prospective only. The case holds:

> There is nothing in any of the statutes to which we have referred which either expressly or impliedly gives the Commission authority to give retroactive effect to rates which may be substituted by it for the existing rates of any public utility.... On the contrary ... the statutes are designed to fix rates for the future.... The action of the Commission shall have a prospective rather than a retrospective effect.

*Id.* at 367–68. The statutes here, as in *Old Dominion,* confer no power to engage in retroactive ratemaking.[26] The rate orders reviewed in *Old Dominion* were, as were those promulgated by the Commission here, presumed to be reasonable and effective until altered in the manner and within the period provided by statute, at which

---

**22.** *See also People's Counsel of the District of Columbia v. Public Service Comm'n,* 455 A.2d 391 (D.C.App.1982) (affirming order granting rate increase since Commission properly used utility's end of period rate base rather than average test year rate base to counter effect of attrition); *Potomac Elec. Power Co. v. Public Service Comm'n,* 402 A.2d 14, 18 (en banc) (D.C. App.), *cert. denied,* 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979) ("[i]f recent operating figures are completely ignored, the new rate will be based on old and perhaps no longer valid data.... Although ... the rights of the company to rate relief must be balanced against the interests of the consumer ... it is nonetheless important, in fairness to all, that the latest available operating data not be ignored."); *Washington Gas Light Co. v. Public Service Comm'n,* 452 A.2d 375, 379, 382–83 (D.C.App. 1982) (approving utility rate increase as a result of market pressures and flotation costs associated with issuance of common stock; invoking policy against retroactive ratemaking and holding that rate orders of Public Service Commission, like those of FERC in federal context, entitled to great deference); *Wash. Gas Light Co. v. Public Service Comm'n,* 450 A.2d 1187 (D.C.App.1982); *Chesapeake & Potomac Tel. Co. v. Public Service Comm'n,* 330 A.2d 236 (D.C. App.1974).

**23.** *See Potomac Elec. Power Co. v. Public Service Comm'n,* 402 A.2d at 18.

**24.** *See supra n.* 12.

**25.** One rate took effect on May 1, 1939, the other on July 23, 1941.

**26.** The statutory law here, as in *Old Dominion,* is therefore distinguishable, for example, from the express power given the Interstate Commerce Commission, under the Interstate Commerce Act, to engage in retrospective regulation.

time the newly enacted rate would then become entitled to such presumption.[27] This conclusive presumption of reasonableness applies to each of the superseding rates approved by the Commission after Order 773 was superseded. The court today simply ignores the mandatory statutory presumption of reasonableness, and in its place applies a *de facto* presumption of *un*reasonableness based on a prior—and *essentially unrelated*—invalidation.

The majority thus erroneously stretches the restitutionary period from the 277 days that Order 773 was in effect for an additional 1,549 days until Transit, on January 14, 1973, was taken over by public authorities under the power of eminent domain. Giving such perpetual effect to Order 773 contravenes the heavy weight of authority both in this Circuit and elsewhere against retroactive ratemaking. Restitution in this case should be awarded *only* for overcharges received during the period that Order 773 was in effect, i.e., until it was superseded by Order No. 882 on October 18, 1968.[28] The majority's perpetuation of the invalidity of Order 773 far beyond the period that it was effective, on the rationale that all subsequent orders were merely incremental to Order 773, constitutes an

untimely, outlawed and unprecedented departure from the statutory presumption of reasonableness and validity that accompanies duly adopted rate orders. Such conclusion constitutes nothing more than a *post hoc* rationalization for retroactively invalidating rate orders for alleged "incrementalism" when the orders themselves bore no indication of "incrementalism." In this, the majority commits the error of *post hoc* rationalization which the Supreme Court warned against in *SEC v. Chenery*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947), and *Burlington Truck Lines v. United States*, 371 U.S. 156, 167–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962).[29]

The opinion of the majority, in its claimed reliance on "equity," also violates the time-honored principle that "equity aids the vigilant, not those who slumber on their rights." 2 J. Pomeroy, *Equity Jurisprudence* 169 (5th ed. 1941).[30] To treat all superseding orders as having been determined on an incremental "rate base" approach at this late date, when farepayers were not vigilant and failed timely to attack Orders 882, 900, and 984 on that ground, would thus award petitioners a

27. 34 S.E.2d at 368 ("[R]ates are commission-made, and as long as they are in force they are conclusively presumed to be reasonable ... [t]he Commission has no power to declare them unreasonable retroactively once they are legally established...." (*quoting Mathieson Alkali Works v. Norfolk & Western R. Co.,* 147 Va. 426, 447, 137 S.E. 608, 614 (1927)); *see also City of Norfolk v. Va. Elec. & Power Co.,* 197 Va. 505, 90 S.E.2d 140, 148 (1955) (reviewing Commission's authorization of rate based on utility's use of "escalator clause" which tied charges to company's costs; Commission could not "condemn rates retroactively once legally established ... [and did] not have the power to redetermine rates for a past period at a different level from those actually charged in accordance with filed schedules because that would be to make retroactive rates.") (*citing Old Dominion,* 184 Va. at 15, 34 S.E.2d at 367–68).

28. *See supra* note 12.

29. In *Chenery* and *Burlington Truck Lines,* the Supreme Court held it unlawful to *sustain* administrative orders on a basis not set forth in the order. *Chenery* stressed the "fundamental rule of administrative law.... that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is

authorized to make, must judge the propriety of such action *solely by the grounds invoked by the agency.*" 332 U.S. at 196, 67 S.Ct. at 1577 (emphasis added). The same reasoning applies by analogy when petitioners seek to *modify* a rate order on the basis of some element not announced in that order. Here, the Opinion challenges an order on the basis that it was incremental, *even though there was no statement or assertion* in any of the four orders that superseded Order 773 that the rates fixed by such subsequent orders *were merely incremental or were not based on the most recent financial data that was before the Commission.* Rather, each subsequent fare order represented, *at the time of its issue,* a reasonable charge for mass transit service. The majority seems to have conjured up a contrary conclusion here as a mere post-hoc rationalization for imposition of what it deems an equitable result, long beyond the date that the statute of limitations would permit an attack on the rate fixed by any of the superseding orders.

30. *See Jinks v. Mays,* 464 F.2d 1223, 1227 (5th Cir.1972), *reh'g denied,* 471 F.2d 649 (5th Cir. 1973).

wholly unjustified windfall benefit at Transit's expense.

The majority opinion, finally, is internally inconsistent. In closing, it states that:

The Commission must ensure that the total amount of restitution does not exceed the total of the fare excesses purportedly authorized by the orders under review in these cases.

Opinion at 422. However, the truth of the matter is that by extending 773 as an ongoing fare order for 1,549 days despite the short life of 277 days during which it was effective, the majority extends the operation of Order 773 to periods covered by all subsequent orders that were never properly challenged by any "action" as required by the statute.

### III. EQUITABLE ADJUSTMENTS TO THE RESTITUTIONARY AWARD

Finally, I cannot concur in the rejection by the majority of four of Transit's five requests for equitable adjustment of the restitutionary award. Transit advances five grounds for such adjustment, as follows:

(1) Investors should not be denied a reasonable rate of return on their investment.

The majority (at 417) rejects this argument. I cannot agree, for the reasons discussed in Part I.

(2) Transit should keep the gain from appreciation in value attributable to the difference between market and book value.

The majority (at 417) rejects this argument as well. I disagree, because denying Transit such gain deprives it of both the benefit of the bargain that it struck and

the fair return due on its capital investment.[31] Moreover, under settled principles of utility regulation, such deprivation is confiscatory and therefore violative of the Fifth Amendment to the Constitution.[32]

(3) Transit should be credited for payments made to the District of Columbia in accordance with the agreed settlement of the company's contractual obligation to remove abandoned trolley tracks and repair streets.

The majority (at 417–418) denies any such equitable offset. The position of the majority on this point is especially curious in light of its allowance of deductions for brokerage fees and taxes (*id.* at 412–413) and capital gains taxes (*id.* at 413–415) paid by Transit on the sale of the Fourth Street Shop and Southern Carhouse. Such offsets are consistent with similar allowances we have made earlier in this litigation,[33] and accord with established precedents of this Court. "As a general proposition," we held in *Public Service Co. of New Mexico v. Federal Energy Reg. Comm'n*, 653 F.2d 681, 683 (D.C.Cir.1981), "a regulated utility is allowed to recover from ratepayers all expenses incurred, including income taxes, plus a reasonable return on capital invested in the enterprise and allocated to public use."[34]

(4) Transit is entitled to an offset for earlier monies credited to the farepayer fund.

The majority grants such an offset. I concur, for the same reasons that I would grant the track removal/street repair offset.

---

**31.** *See supra* Part I; *infra* n. 32.

**32.** *See Chicago M. & St. P.R. Co. v. Minnesota ex rel. Railroad & Warehouse Comm'n*, 134 U.S. 418, 10 S.Ct. 462, 33 L.Ed. 970 (1890):

If the company is deprived of the power of charging reasonable rates for the use of its property, and such deprivation takes place in the absence of an investigation by judicial machinery, it is deprived of the lawful use of its property, and thus, in substance and effect, of the property itself, without due process of law and in violation of this Constitution of the United States; and insofar as it is thus deprived, while other persons are permitted to

receive reasonable profits upon their invested capital, the company is deprived of the equal protection of the laws.
134 U.S. at 458, 10 S.Ct. at 467. *See generally* E. Nichols, *Ruling Principles of Utility Regulation: Rate of Return* 10–13 (1955).

**33.** *See D.C. Transit System, Inc. v. Washington Metro. Area Trans. Comm'n*, 485 F.2d 881 (D.C. Cir.1973).

**34.** *Accord, Nepco Municipal Rate Comm'n v. Federal Energy Reg. Comm'n*, 668 F.2d 1327, 1335 (D.C.Cir.1981).

436

(5) Transit may recoup from farepayers any deficiency which existed in its reserve for injuries and damage at the time that its franchise was terminated.

The majority denies such recoupment. I dissent from this denial, because Transit could have passed this deficiency on to farepayers, recovering what it needed through a higher fare. Since this was an uncompensated expense, Transit is, on the strength of the authority cited for claim (3) above, entitled to an equitable offset.

CONCLUSION

In sum, while I concur in Parts I and III of the court's opinion, I must respectfully dissent with respect to Part II. Interest should only be computed on Order 773 during the 279 days it was in effect; and restitution should not be computed for any fares received after October 18, 1968 (the date on which Order 773 was superseded by Order 882). Moreover, in calculating the award due farepayers, the Commission should not allocate restitution based on Transit's gains from transfer of nondepreciable assets, and should also make the equitable adjustments in the award which the majority rejects.